2014-1803

---

# United States Court of Appeals for the Federal Circuit

—————————————

Roxane Laboratories, Inc.,

*Plaintiff-Appellant*,

v.

Camber Pharmaceuticals, Inc. and InvaGen Pharmaceuticals, Inc.,

*Defendants-Appellees*.

—————————————

Appeal from the United States District Court for the District of New Jersey in case no. 2:14-cv-04042-SRC-CLW, Judge Stanley R. Chesler.

---

## NONCONFIDENTIAL BRIEF OF APPELLANT

---

Alexander E. Long
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Facsimile: (858) 523-5450
alexander.long@lw.com

Kenneth G. Schuler*
Marc N. Zubick
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
kenneth.schuler@lw.com
marc.zubick@lw.com

Dated: October 23, 2014          *Counsel of Record

*Counsel for Plaintiff-Appellant*

(*Additional counsel listed on inside cover*)

Gregory K. Sobolski
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
gregory.sobolski@lw.com

Robert J. Gajarsa
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
robert.gajarsa@lw.com

U.S. Patent No. 8,563,032, representative Claim 1 (emphasis added):

1.  A calcium acetate capsule formulation comprising flowable granules comprised of a pharmaceutically acceptable amount of calcium acetate along with other pharmaceutically acceptable adjuvants, wherein said granules are filled into and contained within a pharmaceutically acceptable capsule such that 667 mg of said calcium acetate on an anhydrous basis are present in **said capsule that is <u>size 00</u> or less.**

## __CERTIFICATE OF INTEREST__

Counsel for Plaintiff-Appellant certifies the following:

1. The full name of every party or amicus curiae represented by me is:

   Roxane Laboratories, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   N/A.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Roxane Laboratories, Inc. is a wholly-owned subsidiary of Boehringer Ingelheim Corporation.  No publicly held corporation owns more than 10% of the stock of Roxane Laboratories, Inc.

4. The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or agency or are expected to appear in this court are:

   Latham & Watkins LLP: Kenneth G. Schuler, Alexander P. Long, Marc N. Zubick, Gregory K. Sobolski, Robert J. Gajarsa.

   Sills Cummis & Gross P.C.: Theodora McCormick and Amy M. Handler.

Dated: October 23, 2014                    Respectfully submitted,


                                           /s/ Kenneth G. Schuler
                                           LATHAM & WATKINS LLP
                                           330 North Wabash Avenue
                                           Suite 2800
                                           Chicago, IL 60611
                                           Telephone: (312) 876-7700
                                           Facsimile: (312) 993-9767
                                           kenneth.schuler@lw.com

                                           *Counsel for Plaintiff-Appellant*

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTEREST ............................................................i

TABLE OF AUTHORITIES ..........................................................vv

STATEMENT OF RELATED CASES ...........................................1

STATEMENT OF JURISDICTION............................................1

STATEMENT OF THE ISSUES....................................................1

STATEMENT OF THE CASE.........................................................3

      A.      Hyperphosphatemia And Calcium Acetate Formulations ...................3

      B.      Roxane's Calcium Acetate Capsule Product........................................4

      C.      U.S. Patent No. 8,563,032 ....................................................5

      D.      Pharmaceutical Capsules ...........................................................6

      E.      Proceedings Below ....................................................................8

SUMMARY OF THE ARGUMENT ..........................................10

ARGUMENT ...........................................................................14

I.      STANDARD OF REVIEW AND APPLICABLE LAW..............................14

II.     A PRELIMINARY INJUNCTION WILL NOT DISTURB THE STATUS QUO......................................................................15

III.    THE COURT'S INFRINGEMENT ANALYSIS HINGED ON A LEGALLY ERRONEOUS CLAIM CONSTRUCTION METHODOLOGY ...........................................................16

      A.      The Court Did Not Analyze The Meaning Of "Said Capsule That Is Size 00 Or Less" From The Perspective Of A POSITA.........18

      B.      The Intrinsic Record's Statements About "Said Capsule That Is Size 00" Reflect The Term's Plain Meaning ......................................21

            1.     The Claim Language................................................22

            2.     The Specification ....................................................23

**Page**

3.    The Prosecution History .............................................24

C.    The Extrinsic Evidence Clarifies The Plain And Ordinary
Meaning To A POSITA ....................................................25

IV.    PROSECUTION HISTORY ESTOPPEL DOES NOT BAR THE
APPLICATION OF THE DOCTRINE OF EQUIVALENTS......................29

A.    The Court Relied On Its Erroneous Interpretation Of "Size 00" ........30

B.    The Amendment At Issue Was Not Narrowing ................................30

V.    THE COURT ERRED IN ITS IRREPARABLE HARM ANALYSIS ........34

A.    The Court Erred By Relying On Appellees' Parent
Corporation's Unsubstantiated Ability To Pay A Damages
Award ..................................................................34

B.    Price Erosion Has Established Irreparable Harm to Roxane ..............38

VI.    THE FACTORS THAT THE COURT DID NOT ADDRESS
SUPPORT A PRELIMINARY INJUNCTION ...........................................40

CONCLUSION .....................................................................42

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 5, 37, and 38 relates to confidential business information that is subject to the parties' agreement regarding confidentiality designations.

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbott Laboratories v. Andrx Pharmaceuticals, Inc.*,
    452 F.3d 1331 (Fed. Cir. 2006) ...................................................................41

*Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.*,
    261 F.3d 1329 (Fed. Cir. 2001) ...........................................................20, 26

*Aevoe Corp. v.  AE Tech Co.*,
    727 F.3d 1375 (Fed. Cir. 2013) ...................................................................14

*Apple, Inc. v. Samsung Electronics Co.*,
    678 F.3d 1314 (Fed. Cir. 2012) ...................................................................41

*Aria Diagnostics, Inc. v. Sequenom, Inc.*,
    726 F.3d 1296 (Fed. Cir. 2013) ......................................................29, 36, 39

*Atlas Powder Co. v. Ireco Chemicals*,
    773 F.2d 1230 (Fed. Cir. 1985) ....................................................1, 10, 15, 16

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates*,
    670 F.3d 1171 (Fed. Cir. 2012), *aff'd in relevant part but vacated on
    other grounds, Bard Peripheral Vascular, Inc. v. W.L. Gore & Asso-
    ciates*, 682 F.3d 1003 (Fed. Cir. 2012), *cert. denied*, 133 S. Ct. 932
    (2013)............................................................................................................41

*Black & Decker v. Hoover Service Center*,
    886 F.2d 1285 (Fed. Cir. 2989) ......................................................29, 37, 38

*Bose Corp. v. JBL, Inc.*,
    274 F.3d 1354 (Fed. Cir. 2001) ...........................................................30, 34

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
    664 F.3d 922 (Fed. Cir. 2012) .............................................................34, 40

*Eli Lily & Co. v. American Cyanamid Co.*,
    82 F.3d 1568 (Fed. Cir. 1996) ....................................................................35

**Page(s)**

*Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*,
  765 F.3d 205 (3d Cir. 2014) .................................................................14, 15

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  344 F.3d 1359 (Fed. Cir. 2003) ....................................................................14

*Grain Processing Corp. v. American Maize-Products Co.*,
  185 F.3d 1341 (Fed. Cir. 1999) ....................................................................36

*Highmark, Inc. v. UPMC Health Plan, Inc.*,
  276 F.3d 160 (3d Cir. 2001) .........................................................................14

*IGT v. Bally Gaming International, Inc.*,
  659 F.3d 1109 (Fed. Cir. 2011) ....................................................................22

*Intel Corp. v. ULSI System Technology, Inc.*,
  995 F.2d 1566 (Fed. Cir. 1993) ....................................................................40

*Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*,
  302 F.3d 1352 (Fed. Cir. 2002) ....................................................................13

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) ......................................................................23

*Lighting Ballast Control LLC v. Philips Electronics North America Corp.*,
  744 F.3d 1272 (Fed. Cir. 2014), *petition for cert. filed*, 83 U.S.L.W.
  3006 (U.S. June 20, 2014) (no. 13-1536) .....................................................14

*Litton Systems, Inc. v. Sundstrand Corp.*,
  750 F.2d 952 (Fed. Cir. 1984) ......................................................................15

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)...........................17

*Mikohn Gaming Corp. v. Acres Gaming, Inc.*,
  165 F.3d 891 (Fed. Cir. 1998) ......................................................................14

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
  133 F.3d 1473 (Fed. Cir. 1998) ....................................................................18

**Page(s)**

*Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.*,
    429 F.3d 1364 (Fed. Cir. 2005) ....................................................39

*Phillips v. AWH Corp.*,
    415 F.3d 103 (Fed. Cir. 2005) ........................................ 17, 18, 19, 20, 25, 28

*Polymer Technologies, Inc. v. Bridwell*,
    103 F.3d 970 (Fed. Cir. 1996) ....................................................40

*Pretty Punch Shoppettes, Inc. v. Hauk*,
    844 F.2d 782 (Fed. Cir. 1988) ................................................37, 38

*Primos, Inc. v. Hunter's Specialties, Inc.*,
    451 F.3d 841 (Fed. Cir. 2006) ................................................30, 34

*ResourceQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) ....................................................36

*Riles v. Shell Exploration & Production Co.*,
    298 F.3d 1302 (Fed. Cir. 2002) ....................................................36

*Robert Bosch LLC v. Pylon Manufacturing Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011) ........................................12, 37, 39

*Roxane Laboratories, Inc. v. Camber Pharmaceuticals Inc.*,
    No. 14-4042, 2014 WL 3854140 (D.N.J. Aug. 6, 2014)................................8

*Texas Instruments Inc. v. Tessera, Inc.*,
    231 F.3d 1325 (Fed. Cir. 2000) ................................................36, 38

*Thorner v. Sony Computer Entertainment America LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ....................................................19

*Trebro Manufacturing, Inc. v. FireFly Equipment, LLC*,
    748 F.3d 1159 (Fed. Cir. 2014) ..........................................15, 17, 29, 36, 38

*United States v. Bestfoods*,
    524 U.S. 51 (1998)..................................................................36

**Page(s)**

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008)................................................................................15, 40

## STATUTE

28 U.S.C. § 1292(c)(1).............................................................................................1

## STATEMENT OF RELATED CASES

1.    No other appeal in or from this civil action in the district court was previously before this or another appellate court.

2.    Roxane Laboratories, Inc. ("Roxane") is currently asserting U.S. Patent No. 8,563,032 in two additional pending district court actions: *Roxane Labs., Inc. v. Zydus Pharm. USA, Inc.*, C.A. No. 14-cv-5423 (D.N.J. filed Aug. 28, 2014) and *Roxane Labs., Inc. v. Amneal Pharm., LLC*, C.A. No. 14-cv-5420 (D.N.J. filed Aug. 28, 2014). Those cases may be affected by this Court's decision.

## STATEMENT OF JURISDICTION

This appeal concerns the denial of a preliminary injunction in a patent case. The Court has exclusive jurisdiction under 28 U.S.C. § 1292(c)(1).

## STATEMENT OF THE ISSUES

Whether the court abused its discretion by denying Roxane's application for a preliminary injunction when the court committed legal error by:

1.    Holding that a preliminary injunction would disturb the status quo because Appellees have begun their infringing sales—a proposition that this Court has expressly rejected. *See Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1231 (Fed. Cir. 1985);

2.    Concluding that Roxane did not demonstrate a likelihood of success on literal infringement based entirely on a flawed claim construction methodology in

which the court simply assumed that Appellees' proposed construction was correct without properly analyzing the meaning of the key disputed claim term—a technical term of art—to one of ordinary skill in the art;

3.    Compounding that legally erroneous construction by requiring Roxane to show the patentees' intent *not* to deviate from the plain and ordinary meaning, and by dismissing extrinsic evidence in the form of pharmaceutical references and expert testimony that clarified that the disputed limitation has an ordinary meaning in the art;

4.    Holding that prosecution history estoppel precludes a likely finding of infringement under the doctrine of equivalents, despite the lack of a narrowing amendment; and

5.    Finding that the harm to Roxane is not irreparable based on: (a) Appellees' non-party parent corporation's ability to satisfy an infringement judgment—despite no agreement to do so, (b) the presence of multiple competitors in Roxane's market, and (c) the sweeping assumption that Roxane's eroded prices might recover in the *future* based on *past* market conditions that involved manufacturing and supply constraints that do not exist *today*.

## STATEMENT OF THE CASE

This appeal arises from the court's denial of Plaintiff-Appellant Roxane Laboratories, Inc.'s ("Roxane") request for a preliminary injunction against Defendants-Appellees Camber Pharmaceuticals, Inc. ("Camber") and InvaGen Pharmaceuticals, Inc. ("InvaGen").  Roxane alleges infringement of claims 1-6 of its U.S. Patent No. 8,563,032 ("'032 patent"), which is directed to novel pharmaceutical formulations of calcium acetate capsules.

### A.   Hyperphosphatemia And Calcium Acetate Formulations

Calcium acetate is a potentially life-saving drug for patients suffering from end-stage kidney failure who have abnormally high serum phosphorous levels. A1173-74 ¶ 27.  Such excessive phosphorous can contribute to the progression of renal failure and associated complications.  A1174 ¶ 28.  Calcium acetate is a naturally occurring material that binds phosphorous in the gastrointestinal tract, thereby reducing the amount of phosphorous patients absorb into the bloodstream from food in their diets.  A104 at 1:45-50; A1174 ¶ 29.  Calcium acetate is typically administered orally so that it can act in the gastrointestinal system.  A104 at 1:57-58; A1174 ¶ 30.  Historically, it was formulated into tablets that readily dissolved.  *Id.*  However, due to its unpleasant chalky taste, patient compliance has long been a concern.  A104 at 1:53-59; A1174 ¶ 30.

3

Prior art attempts to address compliance included formulation of calcium acetate tablets into "caplet" form (a capsule-shaped tablet) followed by insertion of the caplets into hard gelatin capsules, to mask the drug's unpleasant taste. *See* A104 at 1:59-67. These "caplets-within-capsules" were embodied by a prior art product marketed by Fresenius Medical Care NA ("Fresenius") under the brand name PhosLo®. *Id.*

The manufacture of such products, however, presented significant limitations. First, it required costly specialized equipment. *See* A104 at 1:67-2:3. Second, the manufacturing process was time consuming because it involved a compression step. *Id.* Third, the process required calcium acetate within a particular bulk density range.[1] A1175 ¶ 32. Therefore, the process was restrictive and susceptible to shortages of the calcium acetate active ingredient within the requisite bulk density range. *Id.*

## B. Roxane's Calcium Acetate Capsule Product

To solve the problems that plagued the prior art products, Roxane developed a novel calcium acetate delivery system that does not require expensive specialized equipment and can use raw calcium acetate having a wide range of bulk densities. Unlike the prior art PhosLo® product, Roxane's calcium acetate product does not include a caplet or a tablet. It is instead a capsule filled with flowable granules of

[1] "Bulk density" is a measure of a material's weight versus volume.

4

CONFIDENTIAL MATERIAL OMITTED

calcium acetate.  A1175 ¶ 33.  Thus, it also achieves the benefit of masking the chalky taste of the drug.

Roxane launched its generic calcium acetate capsule product in the Fall of 2008 after receiving FDA approval and successfully resolving an infringement suit with Fresenius, which has patent rights related to PhosLo®.  A1297 ¶ 2.  Roxane's calcium acetate capsule product was soon one of the company's most successful products.  At times, it captured over 80% of the market, and it recently generated an average of nearly [[                    ]] in gross revenue.  A1144-45 ¶¶ 3, 7-8; A1041 ¶ 24.

### C.    U.S. Patent No. 8,563,032

Roxane is the owner of the '032 patent, which is directed to novel calcium acetate capsule formulations.  The '032 patent reflects the culmination of extensive efforts by Roxane scientists to develop a vehicle to deliver a therapeutically effective amount of calcium acetate to a patient, without the limitations of the prior art.  The '032 patent's inventions, which Roxane's calcium acetate capsule product embodies, solved various problems in the prior art, including the abilities to utilize a wider range of bulk densities for the calcium acetate raw material and use conventional equipment.  *See* A106 at 5:12-21.

Claim 1 is representative:[2]

> 1.  A calcium acetate capsule formulation comprising flowable granules comprised of a pharmaceutically acceptable amount of calcium acetate along with other pharmaceutically acceptable adjuvants, wherein said granules are filled into and contained within a pharmaceutically acceptable capsule such that 667 mg of said calcium acetate on an anhydrous basis are present in **said capsule that is <u>size 00</u> or less**.

A106  at Claim 1.[3]

### D.    Pharmaceutical Capsules

A key issue on appeal is the meaning of the phrase "said capsule that is **size 00** or less."  A capsule is a shell consisting of two sections that fit together. A1172-73 ¶¶ 23-24.  When swallowed, a capsule travels lengthwise down a patient's throat.  A1173 ¶ 25; A2475 ¶ 9.  Therefore, although capsules of a given diameter may have different lengths, it is the diameter that determines whether a human patient can swallow them.  A1172 ¶ 24.  For this reason, capsules are routinely classified according to their diameter.  *Id.*  For human applications, there are eight capsule sizes, reflecting eight different diameters, designated using size numbers 000, 00, 0, 1, 2, 3, 4, and 5 (from largest to smallest diameter).  A2906.

---

[2] The parties' disputes do not relate to any of the additional limitations present in dependent claims 2-5.

[3] All emphasis is added unless stated otherwise.



A size number "00" capsule has a diameter of about 8.5 millimeters, which a human typically can swallow. A1173 ¶ 25. A size number "000" capsule, however, has a larger diameter of about 9.9 millimeters, which a human generally has difficulty swallowing. *Id.*





Roxane's calcium acetate capsule product (above, left) and Appellees' accused calcium acetate capsule product (right) undisputedly have the same diameter. A4; A5 n.2. For this reason, they are both designated with the size number 00. Relevant to this appeal, the only difference is that the accused product has a slightly longer body (so-called "elongated") than Roxane's product. *Id.*

7

### E.    Proceedings Below

In February 2014, Appellees began selling generic calcium acetate capsule products that are the subject of Abbreviated New Drug Application ("ANDA") No. 20-3135 ("the accused product").    That immediately took its toll on Roxane's sales.    Following a diligent investigation of infringement, including a portion of Appellees' ANDA, Roxane promptly filed suit in the U.S. District Court for the Southern District of Ohio.

After receiving additional discovery, including the rest of Appellees' ANDA, Roxane filed a motion for a preliminary injunction.    The following week, however, the court granted Appellees' motion to transfer the case to the U.S. District Court for the District of New Jersey.    There, the court denied Roxane's request for a preliminary injunction.    *Roxane Labs., Inc. v. Camber Pharm. Inc.*, No. 14-4042, 2014 WL 3854140 (D.N.J. Aug. 6, 2014); A1-A15.

To frame Roxane's request for injunctive relief, the court objected that Roxane sought to "alter" the status quo.    A14-15.    The court believed that "the status quo [was] best preserved by denying" the preliminary injunction.    A13-14.

The court also concluded that Roxane did not demonstrate a likelihood of success of showing that the accused product infringes, either literally or under the doctrine of equivalents.    A12.    With respect to literal infringement, the court stated that "the key obstacle for Roxane is found in the undisputed facts that claim 1 . . .

requires a 'capsule that is size 00 or less,' while the accused infringing products are capsules that are size '00el.'" A3-4. The court acknowledged Roxane's proposed construction that, to a person of ordinary skill in the art ("POSITA"),[4] "said capsule that is size 00 or less" implicates a technical term of art, since a POSITA uses one of the eight size numbers (such as 00) to refer to capsule diameter— without imposing a further limitation on the length of the capsule's body. A4.

The court, however, brushed aside Roxane's proposal *without analyzing the limitation from the perspective of a POSITA.* Instead, the court simply assumed that Appellees' construction was correct and concluded that they "raised a substantial question of infringement: the claim requires 'size 00 or less,' and [the accused product] is larger than size 00." A6.

With respect to infringement under the doctrine of equivalents, the court recognized that Appellees did not challenge that any alleged differences between the asserted claims and the accused product are insubstantial. A7. Instead, the court concluded that prosecution history estoppel bars the application of the

---

[4] Roxane's expert stated that a POSITA "would have a master's or doctoral degree in pharmaceutics or a related field, or a bachelor's degree in pharmaceutics or a related field with several years of experience working on the formulation of pharmaceutical products, including capsule products for oral administration." A1171 ¶ 19. Appellees' expert's definition, while slightly different, does not affect the issues on appeal. *See* A1475-76 ¶ 31; A2474 ¶ 6.

doctrine of equivalents based on its belief that the "said capsule that is size 00 or less" limitation was introduced as a narrowing amendment.  A8-12.

The court then concluded that Roxane did not demonstrate irreparable harm. A13.  It rejected Roxane's argument that Appellees did not show their ability to satisfy a damages judgment.  *Id.*  The court further reasoned that, to the extent that Roxane would suffer from price erosion, there was no indication that such harm would be irreversible.  A13-14.  It did not address Roxane's argument that, even if Roxane eventually could raise its eroded prices, it would suffer loss of goodwill and reputational harm among its customers.

## SUMMARY OF THE ARGUMENT

The court's denial of Roxane's request for a preliminary injunction was based on several errors of law and fact.

### *(A) Status Quo*

***First***, the court made a fundamental legal error by holding that a preliminary injunction would disturb the status quo because Appellees had already begun their infringing sales.  A14-15.  "Such a proposition is its own refutation and no other is necessary."  *Atlas Powder*, 773 F.2d at 1231 (rejecting an identical theory as a matter of law).

10

### (B) Claim Construction / Likelihood Of Success On Infringement

**Second**, the court erred in its analysis of the meaning of the limitation "said capsule that is size 00." To conclude that Appellees raised a substantial question of non-infringement, the court simply presumed that Appellees' restrictive construction was correct. The court altogether ignored Roxane's demonstration that, to a POSITA, this limitation is a technical term of art that has a plain and ordinary meaning different than Appellees' proposal. The failure to analyze the meaning of this disputed claim term through the lens of a POSITA was procedurally and legally erroneous.

**Third**, the court compounded its legal error by requiring Roxane to *rebut* the construction that the court presumed was correct. Requiring Roxane to point to express statements in the intrinsic record that **embrace** a claim term's plain and ordinary—rather than **deviate from** or **redefine** it—turns claim construction law on its head.

**Fourth**, the court committed further legal error by refusing to consider extrinsic evidence. Yet extrinsic evidence is particularly important here because it confirms that in the pharmaceutical capsule art, "size 00" designates a capsule diameter—it does not impose a restriction on length. Had the court properly consulted the extrinsic evidence to understand the context of the '032 patent and

11

the background knowledge of a POSITA, it would have been apparent that the ordinary meaning of "size 00" does not designate length.

*Fifth*, the court committed legal error in concluding that amending the claims to include the "said capsule that is size 00" limitation was narrowing for purposes of prosecution history estoppel. That conclusion was premised on the court's erroneous interpretation of the claim term. Moreover, the prosecution history makes clear that the patentees added this limitation to make express what was inherent in the original claims.

### *(B) Irreparable Harm*

*Sixth*, the court committed legal error by assuming that the financial situation of Appellees' *parent corporation* demonstrated that *Appellees* could satisfy an infringement judgment. But the parent corporation is not a party to this litigation and has not bound itself to pay any judgment in this case. It is thus irrelevant to *Appellees'* ability to pay.

*Seventh*, the court erroneously assumed that the price erosion caused by Appellees was irrelevant because there were multiple providers of calcium acetate capsules. That was legal error. *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011) ("[W]ithout additional facts showing that the presence of additional competitors renders the infringer's harm reparable, the

absence of a two-supplier market does not weigh against a finding of irreparable harm.").

*Eighth*, the court clearly erred when it assumed that Roxane's price erosion was not irreversible harm. The court reasoned that *in 2009*, prices for calcium acetate capsules recovered after a generic company entered the market to address unique supply and manufacturing constraints. *Today*, however, there is no indication that such constraints will arise again to drive prices higher. And because there is no longer a price-leading branded pharmaceutical product in the market, there is no upward pressure on prices. The court ignored the market realities.

*Ninth*, even if it believed that price erosion did not constitute irreversible harm to Roxane, the court nonetheless failed to consider Roxane's independent arguments that it will suffer loss of goodwill and reputational harm if it is eventually forced to raise prices back to pre-infringement levels.

\* \* \*

This Court should vacate and remand for further consideration under the proper standards for claim construction, infringement under the doctrine of equivalents, and irreparable harm. *See, e.g., Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1363 (Fed. Cir. 2002) ("[T]he appropriate remedy is

13

. . . to vacate the trial court's previous order and remand for further proceedings in light of this opinion.").

## **ARGUMENT**

## I.    **STANDARD OF REVIEW AND APPLICABLE LAW**

Because the "grant, denial, or modification of a preliminary injunction . . . is not unique to patent law," the law of the regional circuit applies.  *Aevoe Corp. v. AE Tech Co.*, 727 F.3d 1375, 1381 (Fed. Cir. 2013).  In the Third Circuit, a district court's decision to deny a preliminary injunction is reviewed for abuse of discretion, with findings of fact subject to clear error review and conclusions of law to plenary review.  *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014); *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 170 (3d  Cir. 2001).

"[D]ominant effect" must be given to Federal Circuit precedent "insofar as it reflects considerations specific to patent issues."  *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 894 (Fed. Cir. 1998).  Accordingly, this Court has plenary review of the lower court's conclusions on claim construction and prosecution history estoppel.  *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1277 (Fed. Cir. 2014) (en banc) ("[T]he scope of the patent grant is reviewed as a matter of law."), *petition for cert. filed*, 83 U.S.L.W. 3006 (U.S. June 20, 2014) (No. 13-1536); *Festo Corp. v. Shoketsu Kinzoku Kogyo*

*Kabushiki Co.*, 344 F.3d 1359, 1367-68 (Fed. Cir. 2003) (en banc) ("[W]hether prosecution history estoppel applies, and hence whether the doctrine of equivalents may be available for a particular claim limitation, presents a question of law.").

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Ferring*, 765 F.3d at 210; *Trebro Mfg., Inc. v. FireFly Equip., LLC*, 748 F.3d 1159, 1165 (Fed. Cir. 2014). Here, the court found that Roxane had failed to meet its burden on the first two factors. A14.

## II. A PRELIMINARY INJUNCTION WILL NOT DISTURB THE STATUS QUO

The court concluded that because Appellees had already begun selling the accused product, a preliminary injunction would "not . . . preserve the status quo pending trial on the merits, but . . . alter it." A14. According to the court, the "status quo is best served by denying, not granting, [Roxane's] application for a preliminary injunction." *Id.*

That was legal error. "Such a proposition is its own refutation and no other is necessary." *Atlas Powder*, 773 F.2d at 1231 (rejecting that a preliminary injunction should only issue to preserve the state of affairs at the time litigation commences regardless of continuing and future acts of infringement). Although

15

preliminary injunctions routinely issue to preserve "that state of affairs existing immediately before the filing of the litigation," *see, e.g.*, *Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984), "authorizing the wrongdoer to continue [a] wrong . . . is in no realistic sense maintaining the status quo," *Atlas Powder*, 773 F.2d at 1231.

If the court were correct, there would be an automatic presumption against entering a preliminary injunction once an infringer enters the market. This would relegate preliminary injunctions to declaratory judgment suits. Instead, "a preliminary injunction preserves the status quo if it prevents future trespasses but does not undertake to assess the pecuniary or other consequences of past trespasses." *Id.*

Here, a preliminary injunction would prevent future trespasses on Roxane's patent rights. The court's legal error alone is a basis for this Court to remand for the court to reweigh the preliminary injunction factors in light of a proper understanding of the use of a preliminary injunction to preserve the status quo.

## III.  THE COURT'S INFRINGEMENT ANALYSIS HINGED ON A LEGALLY ERRONEOUS CLAIM CONSTRUCTION METHODOLOGY

The court's analysis of Roxane's likelihood of success of showing infringement centered on the parties' dispute over the limitation "said capsule that is size 00 or less"—specifically, the meaning of "size 00." A4-13. Roxane's

16

position is straightforward: a POSITA understands that, in the pharmaceutical capsule context, "capsule that is size 00 or less" refers to those capsules that have a common diameter and are given a "00" designation, including elongated and non-elongated versions of size number 00 capsules. A2358-64. Appellees inappropriately wish to read the word "size" from the perspective of a lay person in order to include any measurement of a capsule's volume. They believe that "size 00" refers to a precise diameter (one dimension) and length (another dimension) of a capsule. Thus, they argue that "size 00" refers to a specific capsule with size number 00 diameter *and* non-elongated length, so as to exclude size 00 capsules that have elongated bodies. *See* A1395-96.

Accordingly, to decide whether Roxane had shown a likelihood of success of showing infringement, the court had to construe (even if preliminarily) the disputed term. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996); *Trebro*, 748 F.3d at 1168. To do so properly, the court should have examined the intrinsic record, assessed relevant extrinsic evidence, and then preliminarily assigned a meaning that is consistent with the understanding of a POSITA. *See Phillips v. AWH Corp.*, 415 F.3d 103, 1313-18 (Fed. Cir. 2005) (en banc). The court's failure to do so was legal error.

**A.    The Court Did Not Analyze The Meaning Of "Said Capsule That Is Size 00 Or Less" From The Perspective Of A POSITA**

In reaching its conclusion about the meaning of "said capsule that is size 00 or less," the court made a fundamental error of law: it adopted Appellees' proposal to read "size 00" from the perspective of a *layperson* and then read the intrinsic record through only that prism.  But it is a bedrock principle that the words of a claim should be interpreted from the perspective and understanding of a POSITA—particularly when such limitations are technical terms of art.  *See Phillips*, 415 F.3d at 1313.  Indeed, this Court has explained that a POSITA "is deemed to read the words used in the patent documents with an understanding of their meaning *in the field*, and to have knowledge of any special meaning and usage *in the field*."  *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

Through its erroneous prism, divorced from the field of pharmaceutical capsules, the court concluded that "[t]here is nothing in the patent or in the prosecution history that indicates that the applicants understood 'size 00' to refer to more than one specific size of capsule . . . . Nor does anything suggest that the applicant, here, understood the invention to include sizes larger than size 00."  A6-7.  The court insisted that there should be express statements that indicate "size 00" includes capsules with a size 00 diameter that also have an elongated body.  *Id.*

18

The court's decision effectively reverses the proper claim construction methodology in two respects. Initially, this Court has emphasized that a patent term is presumed to have its ordinary meaning, and that a patentee has to clearly and unmistakably intend to depart from that meaning. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-68 (Fed. Cir. 2012) (an exception to the use of a term's ordinary meaning requires language in the intrinsic record that is "explicit" and "clear and unmistakable"). Here, the patentees did not intend to *deviate* from the plain meaning of "size 00" as known to a POSITA—they *embraced* it. Because ordinary meaning controls and includes elongated and non-elongated versions of capsules designated with size number 00 diameter, the patentees had no reason to expressly restate that plain meaning. *See id.*

Further, claim construction is an objective inquiry to discern how a POSITA would understand the meaning of a claim term in light of the pertinent intrinsic and extrinsic evidence (if any). *Phillips*, 415 F.3d at 1313-15. "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline" for claim construction. *Id.* at 1313. The court's ruling below effectively converts that objective inquiry into a subjective one focused on how "the applicants understood" the subject limitation. A6.

At most, the court might have observed that the intrinsic record does not expressly state the plain meaning of this limitation. Resort to extrinsic evidence is

appropriate where, as here, the claim limitation at issue "ha[s] a particular meaning in a field of art." *Phillips*, 415 F.3d at 1314. Here, however, the court compounded its legal error by dismissing the ample extrinsic evidence that Roxane presented, including pharmaceutical capsule references and expert testimony.

When the "'intrinsic evidence is insufficient to enable the court to determine the meaning of the asserted claims,' resort may be had to extrinsic evidence." *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1344 (Fed. Cir. 2001) (citation omitted). In *Advanced Cardiovascular*, this Court reviewed the lower court's construction of "a plurality of generally parallel connecting elements" in the context of medical stents. *Id.* (emphasis in original). The claims provided "no indication of the frame of reference in which the connecting elements should be parallel to each other." *Id.* The specification did "not mention the connecting elements being parallel." *Id.* The prosecution history did not resolve the construction. *Id.* There were no "statements by the inventors, or the examiner, that indicate the specific manner in which the connecting elements are required to be generally parallel to each other." *Id.* Against that intrinsic record, this Court remanded for the district court to consider extrinsic evidence, "'such as expert testimony . . . and technical treatises and articles,'" which were "particularly helpful . . . when . . . properly determining what [the claim limitation]

means *to someone skilled in the art*," *id.* (citation omitted), rather than a layperson.

Here, as discussed in Section III.B, the intrinsic record is consistent with Roxane's proposed construction. To the extent that the intrinsic record does not expressly restate the ordinary meaning of this term, then proper claim construction methodology makes the extrinsic evidence that Roxane set forth "particularly helpful" to understand this term of art from the perspective of a POSITA. *Id.* And, as explained in Section III.C, that extrinsic evidence indicates that, in the pharmaceutical capsule context, "size 00" designates a common capsule diameter—it does not impose a restriction on length or volume.

## B. The Intrinsic Record's Statements About "Said Capsule That Is Size 00" Reflect The Term's Plain Meaning

Based on its presumption that Appellees' narrowing construction was correct, the court emphasized that nothing in the intrinsic record indicates "that the applicants understood 'size 00' to refer to *more than* one specific size of capsule." A6. Such a requirement reverses the cannons of claim construction.

The plain meaning of this claim term to a POSITA ordinarily includes both elongated *and* non-elongated versions of capsules with a common diameter, which are thus designated with a size number 00. The question should then be whether the '032 patentees intended to refer to *less than* the full scope of the term. There is no such indication. Indeed, the intrinsic record does not distinguish between the

21

elongated and non-elongated versions because the '032 patentees had no reason to address (let alone distinguish or disclaim) the various capsules with a common diameter designated with the size number 00.

### 1.    The Claim Language

This Court has "caution[ed] that claim language must be construed in the context of the claim in which it appears. Extracting a single word from a claim divorced from the surrounding limitations can lead construction astray." *IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1117 (Fed. Cir. 2011).  Here, the court misinterpreted "size 00" by divorcing it from the context of Claim 1.  The claim relates to "a pharmaceutically acceptable capsule," A106, whose diameter is not so large that a patient cannot swallow it.  The court's statement that swallowability was an "unpersuasive tangent," A5, underscores its isolated analysis divorced from the pharmaceutical context of the claim.

The antecedent for the recited "*said* capsule that is size 00 or less" is "a pharmaceutically acceptable capsule."   In the context of the '032 patent, pharmaceutical acceptability refers to whether a human may swallow the capsule, since that is the mode of administration for calcium acetate capsules.  Appellees have not disputed that the '032 patent is directed to a formulation that is administered orally to a human.   *See* A1382; A1395-96; A1398; A1404-05. Moreover, the specification notes a need for "a calcium acetate product that

provides an effective dose of the active product without the unpleasant *taste* associated with the calcium acetate active substance." A104 at 2:3-9. The context of Claim 1 provides no indication that the "size 00" limitation imposes a restriction on length—a parameter that is not determinative of swallowability.

### 2.    The Specification

The '032 patent specification is consistent with the claim language. It discloses that "[c]alcium acetate is typically administered orally." A104 at 1:53-56; *see also id.* at 2:7-9. As the court recognized, both elongated and non-elongated versions of size 00 have the same diameter, and are recognized as the largest size capsule that can generally be swallowed by humans. A5 n.2; *see also* A1173 ¶ 25; A2489-90 ¶¶ 54-56.

Additionally, the specification non-restrictively discloses "one embodiment of the invention" as containing "*a* size 00 capsule," rather than "*the* size 00 capsule," reflecting that there is more than one capsule that is designated "size 00" in the field. A105 at 3:29-30. Thus, the specification reflects the background understanding of a POSITA that "size 00" designates various capsules that share the same size designation because they have a common diameter, as opposed to one specific type of capsule constrained by diameter **and** length. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the

specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").

### 3.    The Prosecution History

The prosecution history reinforces that the '032 patentees' statements about the claimed "said capsule size that is 00 or less" (and capsule sizes more generally) are consistent with the plain meaning to a POSITA.  The court acknowledged that, during prosecution, the patentees often referred to the plural form of "capsules." A4-5; A6 n.4.  The court, however, concluded that this "does not appear to have any significance," and stated that "the intermittent use of the plural form seems to reflect the fact that pharmaceutical doses are typically manufactured in quantity." A6.  That is incorrect.

Embedded in the court's conclusion is the presumption that, because the plain meaning of the limitation to a POSITA refers only to the non-elongated size 00 capsule, the patentees' statements concerning various 00 "capsules" referred to manufacturing quantities.  But that statement is based solely on the Court's view as a layperson rather than the manner in which one of skill in the art would view those statements.  *See* Section III.A.  Moreover, because the plain meaning to a POSITA of this limitation expansively includes versions of "size 00" capsules with a common, swallowable diameter, the patentees' use of the plural form at

24

minimum indicates an absence of a clear and unmistakable desire to deviate from (let alone restrict) the plain meaning and scope of "size 00."

Indeed, the prosecution history contains no clear and unmistakable statements that the claims should exclude elongated versions of size number 00 capsules. Instead, when referring to the claimed invention, the patentees repeatedly referred to "size 00 capsule**s**." *See* A295; A297; A347; A349; A351; A380; A382. The use of the plural reflects that, ordinarily, any capsule version designated as "00" is within the ambit of the claim term. At a minimum, the prosecution history lacks the requisite clear and unmistakable intent to limit the claims to just one variant of "size 00."

## C.    The Extrinsic Evidence Clarifies The Plain And Ordinary Meaning To A POSITA

The court summarily dismissed Roxane's extrinsic evidence simply because it believed that this was "the wrong place to start." A5. As an initial matter, Roxane did not—and does not—contend that the construction of this limitation should *begin* with extrinsic evidence. Rather, Roxane contends that such evidence reveals that the subject limitation is a term of art whose plain meaning is plainly apparent to a POSITA. *See Phillips*, 415 F.3d at 1313 (noting that a POSITA "'is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field'" (citation omitted)). Further, Roxane set forth extrinsic

evidence because, to the extent that the claim term's plain meaning is not apparent from the intrinsic evidence, the extrinsic evidence is "particularly helpful" to better contextualize the intrinsic record. *Advanced Cardiovascular*, 261 F.3d at 1344.

The court made only two cursory remarks about the extrinsic evidence. First, it acknowledged the opinion of Dr. Kinam Park, Roxane's expert in pharmaceutical formulations. A4-5. Dr. Park explained that, based on his decades of experience and his review of pharmaceutical capsule literature, a POSITA understands that "size 00" is a designation that refers to capsules with a common diameter, and thus includes elongated and non-elongated versions. A4-5 & n.2; A2475 ¶ 9. But the court apparently misunderstood the import of Dr. Park's opinion because it concluded that "[t]he fact that the capsules have the same diameter says nothing about what the term 'size 00' means." A5 n.2. As Dr. Park explained, however, that is *precisely* the point—a POSITA knows that elongated and non-elongated versions are both designated as size 00 capsules because they have a common diameter. A1172-73 ¶¶ 24-25, A1180-82 ¶¶ 50-54.

Second, the court wrote, "what is absent from Roxane's extrinsic evidence: an independent reference showing a use of the term 'size 00' to refer to a size 00 el capsule." A5 n.3. That is incorrect. The extrinsic evidence confirms that, in this art, use of the eight different size numbers (including size "00") designates capsules with the same diameter, including elongated and non-elongated versions.

26

Professor Banker's "Modern Pharmaceutics" (2002 edition) textbook states that, "[f]or human use, empty gelatin capsules are manufactured in *eight* sizes, ranging from 000 (the largest) to 5 (the smallest) . . . Size 0 and *size 00 hard gelatin capsules having an elongated body (e.g., 0E and 00E)* also are available that provide greater fill capacity without an increase in their respective diameters." A2539. If elongated and non-elongated versions were separate capsule sizes, as Appellees and the court believe, then there would be *more* than eight sizes—*e.g.*, 000, 00el, 00, 0el, 0, 1, 2, 3, 4, 5. Professor Banker's textbook reflects that the size number 00 designates a common diameter and includes capsules with non-elongated *and* elongated body lengths.

Next, a capsule manufacturer's catalog confirms that elongated and non-elongated versions are both designated as having size number "00." A2607. That catalog even depicts *both* the 00 and 00el capsules as variants of a single capsule size:



27

*Id.* Consistently, yet another capsule manufacturer's online catalog even explains that "EL" stands for "Elongated," and that "*00el is an elongated version of size 00*." A2614.

Additionally, the "Hard Capsules: Development and Technology" textbook (1987) describes commercially-available capsule products. It identifies both "standard" and "elongated" length capsules as being within the same "capsule size" designation. A2635 (highlighting below added). This reference thus shows unequivocally that in the pertinent field, "size" does not speak to length, and in fact includes both elongated and non-elongated versions.

**Table 11.2.** Dimensions of capsules made by Scherer, measured at a moisture content of 12–16%

| Capsule size | Body length (A) mm | Cap length (B) mm | Body diameter mm | Cap diameter mm | Filled length (C) mm | Volume of standard length ml | Volume of elongated length ml |
|---|---|---|---|---|---|---|---|
| 0 | 18.69 | 11.05 | 7.35 | 7.65 | 22.0 | 0.7 | 0.76 |
| 1 | 16.55 | 9.82 | 6.65 | 6.90 | 19.6 | 0.5 | 0.54 |
| 2 | 15.29 | 9.04 | 6.10 | 6.36 | 18.0 | 0.4 | 0.45 |
| 3 | 13.66 | 8.12 | 5.60 | 5.85 | 16.2 | 0.3 | 0.34 |
| 4 | 12.39 | 7.36 | 5.09 | 5.34 | 14.7 | 0.21 | 0.22 |
| Tolerance | ±0.3 | ±0.3 | ±0.05 | ±0.05 | — | — | — |

Each of these references confirms that size number 00 designates capsules with a common diameter, including non-elongated and elongated versions. It is appropriate to consult this extrinsic evidence to contextualize the ordinary use of the disputed limitation in the field of pharmacological formulations and capsules. *See Phillips*, 415 F.3d at 1313-14, 1318. This Court should remand with instructions to the court to perform claim construction in light of the extrinsic evidence.

\* \* \*

The court's conclusion that Roxane did not establish a likelihood of success on literal infringement was based on a legally erroneous claim construction methodology. Accordingly, this Court should vacate the denial of the preliminary injunction and remand for consideration of the remaining preliminary injunction factors. *See, e.g.*, *Trebro*, 748 F.3d at 1168, 1171 (vacating denial of preliminary injunction which was based on erroneous claim construction and analysis of irreparable harm); *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1303-04 (Fed. Cir. 2013) ("Accordingly, because of the district court's erroneous constructions, this court reverses that court's conclusion that [the defendant] had raised a substantial question of noninfringement."); *Black & Decker v. Hoover Serv. Ctr.*, 886 F.2d 1285, 1292 (Fed. Cir. 1989) (vacating denial of preliminary injunction).

## IV. PROSECUTION HISTORY ESTOPPEL DOES NOT BAR THE APPLICATION OF THE DOCTRINE OF EQUIVALENTS

The court committed independent legal error by concluding that prosecution history estoppel bars application of the doctrine of equivalents. A8-12. The court concluded that the "said capsule that is size 00 or less" limitation was introduced as part of a narrowing amendment. A8. It rejected Roxane's explanation that the patentees added this limitation in order to clarify the Examiner's persistent failure to understand that the claimed "pharmaceutically acceptable capsule" recited in the

29

original claims necessarily limited the claims to a capsule designated as a 00 or less. *Id.*

## A.    The Court Relied On Its Erroneous Interpretation Of "Size 00"

As an initial matter, the court's conclusion regarding prosecution history estoppel was premised on its erroneous assumption that "size 00" excludes elongated versions.  A12 ("Because this Court is not persuaded that the applicants understood 'size 00' to refer to a family of sizes which includes capsule size 00el, this Court finds that the applicants surrendered coverage of any capsule larger than size 00.")  Thus, if this Court agrees that the court's claim construction was legally and procedurally erroneous, the court's premise for finding a narrowing amendment also fails.

## B.    The Amendment At Issue Was Not Narrowing

Independently, the court erred by concluding that amending Claim 1 to include the limitation at issue narrowed its scope.   Rather, the amendment expressed an inherent aspect of the pre-existing "pharmaceutically acceptable capsule" limitation.   That is not narrowing.   *See Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 849 (Fed. Cir. 2006) ("addition of the term 'length' did not narrow the scope of the claim because every physical object has a length"); *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001) (addition of "ellipse having a major diameter" did not narrow a claim that already recited "an ellipse"

because "it would be reasonably ascertainable by those skilled in the art that an ellipse is inherently understood to have a major diameter").

Here, the introduction of "said capsule that is size 00 or less" made explicit that the "pharmaceutically acceptable capsule" is necessarily one that has a diameter that does not prohibit a human patient from swallowing it.

As originally filed, Claim 1 recited:

> 1. A calcium acetate capsule formulation comprising granules comprised of a pharmaceutically acceptable amount of calcium acetate along with other pharmaceutically acceptable adjuvants, wherein said granules are contained within *a pharmaceutically acceptable capsule*.

A120.

The Examiner rejected that claim as obvious based on Dennett in view of Nakai. A285-87 ¶¶ 13-17. The Examiner stated that Dennett did not disclose "*the capsule* as containing free flowing calcium acetate." *Id.* ¶ 15. He stated that Nakai "is drawn to a process of granulating calcium acetate to form granules that can be separated and sized using sieves . . . [t]he granular calcium acetate is to be contained within a *capsule*." *Id.* ¶ 16. The Examiner concluded that "it would have been obvious . . . to combine the teachings of Dennett and Nakai . . . in arriving at *a capsule* which comprises flowable granules of calcium acetate." *Id.* ¶ 17.

31

The patentees understood that the Examiner's rejection was incorrect in part because the Nakai reference did not disclose flowable granules of calcium acetate in "a pharmaceutically acceptable amount" that could be contained within a claimed "pharmaceutically acceptable capsule."  A297.  It was in this context that the patentees introduced the relevant amendment:

> 1. A calcium acetate capsule formulation comprising flowable granules comprised of a pharmaceutically acceptable amount of calcium acetate along with other pharmaceutically acceptable adjuvants, wherein said granules are filled into and contained within a pharmaceutically acceptable capsule **such that 667 mg of said calcium acetate on an anhydrous basis are present in said capsule that is size 00 or less.**

A292 (emphasis in original).[5]

This amendment made express what was already implicit in the original claim.  First, it stated that the pre-existing "pharmaceutically acceptable amount of calcium acetate" limitation meant "667 mg . . . on an anhydrous basis."  Second, it rectified the Examiner's imprecise statement about "a capsule" to state expressly that the recited "pharmaceutically acceptable capsule" had to not only contain the requisite amount of calcium acetate, but also be of a size number such that it could be swallowed.

---

[5] Earlier amendments had introduced the "comprising flowable granules" and "filled into and contained" limitations.  *See* A240 at Claim 1.

32

Accordingly, the patentees told the Examiner that "Nakai's process of encapsulation without compression is deficient because its granular material cannot be filled and contained in capsules such that 667 mg of calcium acetate on an anhydrous basis is present in size 00 capsules." A297. Similarly, the patentees included the Declaration of inventor Dr. Shehla Uraizee, which demonstrated that, in an experiment based on the Nakai reference, she could not "fill the granules into size 00 capsules." A305-07. In setting the context for her capsule filling experiment, she explained that "[t]he maximum capsule size that is acceptable for oral administration to humans is a Size 00 capsule. Therefore, the pharmaceutically acceptable capsule size is Size 00 or less." A305.

These statements do not indicate that the applicants believed that they had initially claimed elongated versions of size 00 capsules and now suddenly claimed only non-elongated versions. The applicants instead confirmed that the claims did not encompass capsules "having a size number 000" because such capsules "are not normally administered to humans" for oral use, tracking the original "pharmaceutically acceptable capsule" claim term. A382.

The Patent Trial and Appeal Board ("Board") understood that the claims included capsules designated with size number 00 and excluded only those in the size 000 family. A412. Though the Examiner maintained his rejection, the patentees submitted Dr. Uraizee's declaration to the Board. It concluded that

33

"[t]he claims therefore do not read on size 000 capsules containing 667 mg of calcium acetate," confirming that the claimed "size 00 or less" is distinct *only* from the capsules designated as 000.

The patentees' amendment stated the implicit scope of the original claims. It was not narrowing as a matter of law and thus precludes the presumptive application of prosecution history estoppel. *See Primos*, 451 F.3d at 849; *Bose*, 274 F.3d at 1359.

## V.    THE COURT ERRED IN ITS IRREPARABLE HARM ANALYSIS

Concrete record evidence demonstrated that Appellees' continued infringing activity is causing Roxane significant irreparable harm through price erosion, lost sales, and loss of goodwill. *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (holding that a patentee may rely on evidence of "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities" to establish irreparable harm). The court abused its discretion by finding otherwise.

### A.    The Court Erred By Relying On Appellees' Parent Corporation's Unsubstantiated Ability To Pay A Damages Award

The court concluded that Appellees' status as "wholly-owned subsidiaries of a major corporation," Hetero Drugs Ltd. ("Hetero"), demonstrated their ability to

satisfy an infringement judgment. A13.[6] That was legal error untethered to record evidence.

Hetero is not a party to this litigation. Its financial status is irrelevant to the irreparable harm analysis because Appellees' corporate veil is not pierced and Hetero has not agreed to satisfy a damages award. *See United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998) ("[I]t is hornbook law that the exercise of the control which stock ownership gives to the stockholders will not create liability beyond the assets of the subsidiary.") (internal quotation marks and citation omitted); *cf. Eli Lily & Co. v. Am. Cyanamid Co.*, 82 F.3d 1568 (Fed. Cir. 1996) (explaining that a parent corporation's ability to pay its subsidiary's adverse judgment would be a factor in determining ability to pay *if* there was a promise to do so).

At the preliminary injunction hearing, the court inquired about Hetero's role. Counsel for Appellees stated that Hetero had not stipulated to be liable for damages:

> The Court: . . . so let me ask this. Is defendant suggesting that the parent company might agree to be liable for any infringement damages that occur here?
>
> Mr. Silver [Defendants/Appellees' counsel]: Yes.

---

[6] The court's statement was also factually inaccurate. Appellees' own declarant indicated that Hetero owns all of the stock of Camber but only owns 72% of the stock of InvaGen. A1433 n.38.

> The Court: Now, going beyond suggesting, are you prepared to stipulate to that and do you have authority to stipulate to it?
>
> Mr. Silver:  ***I do not have authority.  I could certainly get that authority from the parent company.***  Your Honor, the parent company, Hetero Drugs, I have represented for 25 years.  I know the owner.  I attended his son's wedding.  His son's wedding was $15 million and is far more than what this whole case is about.  So, I think they can afford to pay if they had to.  ***But I do not have that authority*** here . . . .

A3121 at 75:7-22.  To date, Hetero has not so stipulated.

The court assumed Appellees' ability to pay based on Hetero's financials *despite* a lack of record evidence or even an assurance from Appellees' counsel to corroborate such an assertion.[7]  Yet, a court must base its determination on established facts in an analysis that permits meaningful review.  *See, e.g.*, *Trebro*, 748 F.3d at 1172 (vacating denial of preliminary injunction for errors of law and for failure to properly consider facts in the record); *Aria Diagnostics*, 726 F.3d at 1304 (holding that a court must base its irreparable harm decision on facts, not assumptions); *Texas Instruments Inc. v. Tessera, Inc.*, 231 F.3d 1325, 1332 (Fed. Cir. 2000) (vacating denial of preliminary injunction in part for failure to

---

[7] The court's reliance on "the nature of the market" is inexplicable.  A13.  This consideration is generally relevant to the construction of a hypothetical market absent infringement—not to the ability of an accused infringer to satisfy a judgment.  *See, e.g.*, *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010); *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002); *Grain Processing Corp. v. Am. Maize–Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).

CONFIDENTIAL MATERIAL OMITTED

adequately find facts); *Black & Decker*, 886 F.2d at 1292 (vacating denial of preliminary injunction in part on abuse of discretion grounds for failure to find facts); *Pretty Punch Shoppettes, Inc. v. Hauk*, 844 F.2d 782, 785 (Fed. Cir. 1988) (vacating denial of preliminary injunction and explaining that the court "improperly focused on [the defendant's] statement that she would be able to meet any damages due").

Here, there is no indication that Appellees will be able to afford the judgment that may potentially exceed [[                    ]][8]  *See Robert Bosch LLC*,

---

[8] Within months of launching the accused product, Camber poached two of Roxane's valued repeat customers through low-priced infringing sales. This caused Roxane to suffer lost profits of more than [[            ]] *per month*. A1145 ¶ 9. Roxane also stands to lose an additional [[            ]] in profit *per month* on remaining sales due to price erosion. A1041 ¶ 25; A1145 ¶ 9. That represents over [[            ]] per year in direct damages attributable to Camber's infringing activity. Assuming approximately two years to final judgment, total damages could therefore top [[            ]] if there is a finding of willful infringement.

There is no indication that Camber can cover such a loss. Roxane's financial expert estimated that Camber had annual sales ranging from around [[            ]] to approximately [[            ]] prior to its launch of the accused product. A1042-43 ¶ 28. Accounting for the sales to the customers that Camber poached from Roxane [[            ]], Camber's sales during the suit can be expected to range from only around [[            ]] annually. *See* A1041-43 ¶¶ 25-28; A1145-46 ¶¶ 7-10. Generic pharmaceutical companies generally have a 5-10% profit margin, A1042-43 ¶ 28—[[            .]] Generously assuming that Camber has profit margins on the high end of that range, Camber can reasonably be expected to have a maximum of only around [[            ]] in profits per year. Absent a

---

CONFIDENTIAL MATERIAL OMITTED

659 F.3d at 1155 (explaining that the "questionable financial condition" of a defendant supports a finding of irreparable harm).

"The district court's consideration of the evidence is thus simply too incomplete for adequate review of its denial of the [preliminary injunction] motion," and it should be vacated as an abuse of discretion. *Black & Decker*, 886 F.2d at 1292; *see also Trebro*, 748 F.3d at 1172; *Texas Instruments*, 231 F.3d at 1332; *Pretty Punch*, 844 F.2d at 785.

### B.    Price Erosion Has Established Irreparable Harm to Roxane

There is no real dispute that Appellees' infringing sales of calcium acetate capsules have caused price erosion to Roxane. *See* A1041-43 ¶¶ 25-28; A1145-46 ¶¶ 7-10.  But the court found that price erosion would not cause irreparable harm because Roxane was not an exclusive provider of calcium acetate products and any erosion was reversible over time.  The first conclusion was legal error; the second was a clear error of fact.

First, the court erroneously ignored the effects of price erosion because there was "competition from others marketing an identical product."  A13.  "[W]ithout additional facts showing that the presence of additional competitors renders the infringer's harm reparable, the absence of a two-supplier market does not weigh

---

preliminary injunction, Roxane will likely suffer over [[            ]] in unrecoverable losses every year that this suit continues.

against a finding of irreparable harm." *Robert Bosch LLC*, 659 F.3d at 1151; *see also Aria Diagnostics*, 726 F.3d at 1305 ("the fact that other infringers may be in the marketplace does not negate irreparable harm" (internal quotation marks omitted)); *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 429 F.3d 1364, 1381 (Fed. Cir. 2005) (same). If the court's reasoning here were correct, there would be "effectively establish[ed] a presumption against irreparable harm whenever the market contains a plurality of players." *Robert Bosch LLC*, 659 F.3d at 1151.

Second, record evidence contradicts the court's determination that any price erosion here will eventually be reversible. The court reasoned that Roxane's prices for calcium acetate previously declined in 2009 when Sandoz entered the market as the authorized generic producer of PhosLo® and recovered several years later. A14. But the record indicates that Roxane's prices rebounded only when Sandoz and Fresenius suffered "manufacturing and/or supply problems" in 2012. A1145-46 ¶ 10. There is no indication—let alone a guarantee—that such problems will repeat themselves in the future. Fresenius has even now phased out sales of the branded product PhosLo®. A1149-63. (spreadsheet showing sales). Without PhosLo® to establish market-leading prices, there is no upward pressure on prices to stimulate a recovery. The court clearly erred by disregarding these facts.

Moreover, even if the court were correct (it is not) that Roxane's price erosion may be reversible, Roxane demonstrated that it will nevertheless suffer

irreparable loss of customer goodwill and harm to its reputation. A1028-29. Once customers become accustomed to the lower prices forced by Appellees' infringing sales, they will not easily accept a return to higher prices. A1146-47 at ¶14. Vacillations in Roxane's prices likely will degrade Roxane's goodwill and reputation in the market. *See Celsis In Vitro*, 664 F.3d at 930 (affirming finding of irreparable harm based on "loss of customer good will" caused by efforts to "restore the original price"); *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996) ("Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option."). This is an independent basis on which Roxane demonstrated irreparable harm.

## VI.  THE FACTORS THAT THE COURT DID NOT ADDRESS SUPPORT A PRELIMINARY INJUNCTION

The court did not address two factors: the balance of equities and the public interest. *See Winter*, 555 U.S. at 20. Both favor the issuance of an injunction here.

Roxane stands to lose millions of dollars in sales that may never be recovered. It has maintained exclusivity over the inventions claimed in the '032 patent. On the other hand, there is no indication that Appellees would have difficulty in complying with the injunction. The injunction will not put Appellees, who sell other products, out of business. *Accord Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568, 1570 (Fed. Cir. 1993) (holding that forcing an accused

infringer out of business can be considered when granting a preliminary injunction).

The public interest also favors an injunction because the public has a strong interest in the enforcement of Roxane's patent rights. *See, e.g.*, *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1338 (Fed. Cir. 2012) ("[B]ecause the record at this stage shows that the [asserted patent] is likely valid and infringed, and there are no other relevant concerns, the public interest is best served by granting a preliminary injunction."); *Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006) ("Although the public interest inquiry is not necessarily or always bound to the likelihood of success o[n] the merits, . . . absent any other relevant concerns . . . the public is best served by enforcing patents that are likely valid and infringed.").   And because there are already multiple suppliers in the calcium acetate market, the public's interest in competition in the pharmaceutical capsule market will not be unduly negatively affected. *Cf. Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 670 F.3d 1171, 1192 (Fed. Cir. 2012) (affirming denial of permanent injunction where district court determined that "it was in the public interest to allow competition in the medical device arena"), *aff'd in relevant part but vacated on other grounds*, 682 F.3d 1003 (Fed. Cir. 2012), *cert. denied*, 133 S. Ct. 932 (2013).

## **CONCLUSION**

This Court should vacate the denial of Roxane's Motion For Preliminary Injunction and remand to correct the court's legal errors and provide Roxane with a fair and full opportunity to obtain the injunctive relief it seeks.

Dated: October 23, 2014

Alexander P. Long
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Facsimile: (858) 523-5450
alexander.long@lw.com

Respectfully submitted,

/s/Kenneth G. Schuler
Kenneth G. Schuler*
Marc N. Zubick
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
kenneth.schuler@lw.com
marc.zubick@lw.com

*Counsel of Record*

Gregory K. Sobolski
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
gregory.sobolski@lw.com

Robert J. Gajarsa
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
robert.gajarsa@lw.com

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2014, I caused two copies of the Confidential and Nonconfidential Versions of the foregoing Brief of Appellant to be served by hand-delivery upon the following counsel for Appellee:

> Robert S. Silver
> CAESAR, RIVISE, BERNSTEIN,
> COHEN & POKOTILOW, LTD.
> Seven Penn Center - 12th Floor
> 1635 Market Street
> Philadelphia, PA 19103-2212
> rssilver@crbcp.com

/s/ Kenneth G. Schuler
Kenneth G. Schuler

# CERTIFICATE OF COMPLIANCE WITH RULE 32

I hereby certify that this brief complies with the type-volume limitations of FED. R. OF APP. P. 32(a)(7)(B) because the brief contains 8,994 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and FED. CIR. R. 32(b).

I further certify that this brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) because this brief was prepared using Microsoft Word 2003 in 14-point Times New Roman font.

/s/ Kenneth G. Schuler
Kenneth G. Schuler

*Roxane Laboratories, Inc. v. Camber Pharmaceuticals, Inc.*
*and InvaGen Pharmaceuticals, Inc.*
**No. 2014-1803**

**ADDENDUM**

| Page Nos. | Date | Description |
|-----------|------|-------------|
| A1-A15 | 08/16/14 | Opinion & Order |
| A101-A106 | 10/22/13 | U.S. Patent No. 8,563,032 |

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

ROXANE LABORATORIES, INC.,

     Plaintiff,

         v.

CAMBER PHARMACEUTICALS INC. et al.,

     Defendants.

_____

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 14-4042 (SRC)

**OPINION & ORDER**

**CHESLER**, U.S.D.J.

This matter comes before the Court on the motion for a preliminary injunction by

Plaintiff Roxane Lanoratories, Inc. ("Roxane") against Defendants Camber Pharmaceuticals Inc.

and InvaGen Pharmaceuticals Inc. (collectively, "Defendants").  This Court held oral argument

on this motion on July 31, 2014.  For the reasons stated below, the motion will be denied.

## BACKGROUND

This case arises from a patent infringement dispute involving a pharmaceutical, calcium

acetate capsules.  Roxane owns U.S. Patent No. 8,563,032 (the "'032 patent"), directed to a

pharmaceutical calcium acetate formulation; Roxane markets a generic calcium acetate capsule

product.  Defendants are pharmaceutical manufacturers who market competing generic calcium

acetate capsule products.  In March of 2014, Roxane filed a Complaint alleging patent

infringement in the United States District Court for the Southern District of Ohio.  Defendants

moved to dismiss the Complaint or, alternatively, to transfer the case to the District of New

Jersey.  Roxane opposed the motion and also moved for a preliminary injunction, seeking to

A1

enjoin Defendants from marketing their generic calcium acetate capsule products.  The Ohio

Court granted the motion to transfer and transferred the case to the District of New Jersey, where

the parties completed briefing on the preliminary injunction motion.

**APPLICABLE LEGAL STANDARDS**

## I.      Preliminary Injunction

"The grant of a preliminary injunction under 35 U.S.C. § 283 is within the discretion of

the district court."  Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1378 (Fed.

Cir. 2006).  "A plaintiff seeking a preliminary injunction must establish that he is likely to

succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in his favor, and that an injunction is in the public

interest."  Winter v. NRDC, Inc., 129 S. Ct. 365, 374 (2008).

As to the requirement that the movant establish that he is likely to succeed on the merits,

the Federal Circuit has held:

> [T]he patentee seeking a preliminary injunction in a patent infringement suit must
> show that it will likely prove infringement, and that it will likely withstand
> challenges, if any, to the validity of the patent.  In assessing whether the patentee
> is entitled to the injunction, the court views the matter in light of the burdens and
> presumptions that will inhere at trial. . . .

Titan Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1376 (Fed. Cir. 2009) (citation

omitted).  "An accused infringer can defeat a showing of likelihood of success on the merits by

demonstrating a substantial question of validity or infringement."  Trebro Mfg. v. FireFly Equip.,

LLC, 748 F.3d 1159, 1165 (Fed. Cir. 2014).  "A preliminary injunction should not issue if an

alleged infringer raises a substantial question regarding either infringement or validity, i.e., the

alleged infringer asserts an infringement or invalidity defense that the patentee has not shown

2

A2

lacks substantial merit." <u>AstraZeneca LP v. Apotex, Inc.</u>, 633 F.3d 1042, 1050 (Fed. Cir. 2010).

At trial, the plaintiff bears the burden of proving infringement by a preponderance of the evidence. <u>Tech. Licensing Corp. v. Videotek, Inc.</u>, 545 F.3d 1316, 1327 (Fed. Cir. 2008).

## ANALYSIS

**I. Roxane has not demonstrated that it is likely to succeed on the merits.**

Roxane first argues that this Court should preclude Defendants from relying on their noninfringement and invalidity arguments, contending that Defendants failed to disclose them previously, in violation of this district's Local Patent Rules. Roxane has overlooked a key provision in the Local Patent Rules: while these rules do establish a structure for the disclosure of infringement and invalidity contentions by both sides, L. Pat. R. 3.1 specifies that the trigger for these obligations is the initial scheduling conference. No initial scheduling conference has been held in this case, and Defendants have not failed to comply with their disclosure obligations under the Local Patent Rules.

Additionally, to the extent that Roxane contends that Defendants failed to provide appropriate discovery while the case was pending in Ohio, the Court notes that Plaintiff made no request before that court to compel discovery. Indeed, Roxane's motion for expedited discovery remained undecided until this Court decided that it was moot, in light of the current posture of the case. Under these circumstances, the Court declines to impose any sanction sought by Plaintiff.

To obtain a preliminary injunction, Roxane must show that it will likely prove infringement, and that it will likely withstand challenges, if any, to the validity of the patent. Roxane has not demonstrated that it will likely prove infringement. In brief, the key obstacle for

3

A3

Roxane is found in the undisputed facts that claim 1 of the '032 patent requires a "capsule that is size 00 or less," while the accused infringing products are capsules that are size "00el." The parties agree that size 00el capsules have the same diameter as size 00 capsules, but are slightly elongated, so that they are longer and thus have greater volume. Roxane argues two theories of infringement: Defendants' products infringe both literally and under the doctrine of equivalents.

"Determining the likelihood of infringement requires two steps, first claim construction and second a comparison of the properly construed claims to the accused product." Pfizer, Inc. v. Teva Pharms. USA, Inc., 429 F.3d 1364, 1372 (Fed. Cir. 2005). In the context of a motion for a preliminary injunction, the Court's claim construction is preliminary as well: "a conclusion of law such as claim construction is subject to change upon the development of the record after a district court's decision on a motion for preliminary injunction." Id. at 1377.

Roxane's literal infringement theory depends on this proposed claim construction: "capsule that is size 00" means "capsule that is in the size 00 family, which includes size 00el."

> [T]he words of a claim are generally given their ordinary and customary meaning. . . [T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.

Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005). Roxane contends that the ordinary meaning of "size 00" is "in the size 00 family."[1] In support, Roxane begins by pointing to a number of pieces of extrinsic evidence, including a declaration from their expert, Dr. Park,

---

[1] At the outset, the Court wonders about the use of the "family" metaphor here. Are there really capsule size families that make up the capsule size community?

4

A4

who asserts that a size 00el capsule is a size 00 capsule that is elongated.[2]   Park's second

declaration cites a variety of intrinsic and extrinsic evidence in support, but an expert declaration

is extrinsic evidence of meaning, and "extrinsic evidence in general [i]s less reliable than the

patent and its prosecution history in determining how to read claim terms." Id. at 1318.  Roxane

also cites other extrinsic evidence: an FDA draft document, reference books, and capsule

marketing materials.[3]  This is the wrong place to start claim construction: "[c]laim construction

analysis begins with the intrinsic evidence." Irdeto Access, Inc. v. Echostar Satellite Corp., 383

F.3d 1295, 1299 (Fed. Cir. 2004).

Roxane's reply brief then turns to the intrinsic evidence and offers a few unpersuasive

arguments.  Roxane first observes that the claim states "said capsule that is size 00 or less," and

not "wherein said capsule is size 00 or less."  (Pl.'s Reply Br. 5.)  Roxane argues that the use of

"that is" instead of "wherein" indicates that "'size 00 or less' is simply an attribute of the

antecedent 'pharmaceutically acceptable capsule,' not a further limitation." (Id.)  This is an odd

and unpersuasive tangent.  Whatever "size 00" may mean – not that it seems unclear –, it is

definitely a claim limitation.  This is followed by another unpersuasive tangent about

swallowability.

Roxane next tries to support its proposed construction by parsing some singular forms

and plurals in the prosecution history.  For example, Roxane points to the use of the plural form

---

[2] This is clearly true in that the two have the same diameter and different length, but it does not necessarily have the semantic implications that Roxane contends.  The fact that the capsules have the same diameter says nothing about what the term "size 00" means.

[3] Again, the intrinsic evidence carries greater weight, but the Court notes what is absent from Roxane's extrinsic evidence: an independent reference showing a usage of the term "size 00" to refer to a size 00el capsule.

5

of "capsules" in the applicant's appeal brief submitted to the PTAB.[4]  The problem for Roxane is that the appeal brief shows no consistency in whether the singular or plural form of "capsule" is used – there are plenty of examples of each.  This does not appear to have any significance, and it does not support Roxane's "size family" argument.  As Defendants contend, the intermittent use of the plural form seems to reflect the fact that pharmaceutical doses are typically manufactured in quantity – the calcium acetate is put into more than one capsule, and so the plural is used.

The Court need not come to any conclusion about whether "capsule that is size 00" means "capsule that is in the size 00 family, which includes size 00el."  At this juncture, Roxane bears the burden of showing that it will likely prove infringement, and Defendants may defeat that by raising a substantial issue of infringement, which Roxane fails to show lacks substantial merit. Roxane has failed to show that it will likely prove infringement, and Defendants have raised a substantial question of infringement: the claim requires "size 00 or less," and their product is larger than size 00.  Roxane has failed to persuade that this question lacks substantial merit, but the key conclusion is that Roxane has failed to make a sufficient demonstration of a likelihood of success in proving infringement.

The Court notes that its initial review of all of the intrinsic evidence does not support Roxane's claim construction position.  There is nothing in the patent or in the prosecution history that indicates that the applicants understood "size 00" to refer to more than one specific size of capsule.  The first question that the Court asks is whether the specification discusses the issue of capsule size, and there is just one place in the "Detailed Description of the Invention" which does

---

[4] Roxane argues that the use of the plural form, "capsules," shows that the applicants understood that the invention includes both elongated and non-elongated forms of size 00 capsules.

6

A6

so:

> According to one embodiment of the invention, the capsule is a size 00 capsule containing 667 mg of calcium acetate. Capsules containing smaller doses of the calcium acetate can be sized accordingly using smaller capsules.

'032 patent, col.3 ll.29-33.  Here, the applicant did use the plural form, "capsules," and stated that the size of capsules can vary – but only in the smaller direction, not larger.  This is consistent with the clear language of the claim, which limits the capsule to "size 00 or less."  There is nothing here to suggest that the applicants understood "size 00" to include the larger size 00el.  Nor does anything suggest that the applicant, here, understood the invention to include sizes larger than size 00.  Nor does the prosecution history, which will be discussed in more detail later, support Roxane's position.

Roxane also contends that Defendants infringe under the doctrine of equivalents.  "One way that a patentee may prove that a particular claim element is met under the doctrine of equivalents is by showing that the accused product performs substantially the same function in substantially the same way with substantially the same result as claimed in the patent."  Energy Transp. Group, Inc. v. William Demant Holding A/S, 697 F.3d 1342, 1352 (Fed. Cir. 2012).  Defendants do not oppose this theory by challenging the argument that the differences between the patented invention and their product are insubstantial, but rather by arguing that Roxane is barred from succeeding under this theory by prosecution history estoppel.

The Federal Circuit has summarized the basic principles of prosecution history estoppel as follows:

> Prosecution history estoppel prevents a patentee from recapturing through the doctrine of equivalents the subject matter that the applicant surrendered during prosecution.  It presumptively applies when the applicant made a narrowing claim

7

A7

amendment related to patentability.

Integrated Tech. Corp. v. Rudolph Techs., Inc., 734 F.3d 1352, 1356 (Fed. Cir. 2013) (citation

omitted). Defendants contend that, during prosecution, the applicants made a narrowing claim

amendment related to patentability which surrendered equivalents with capsule sizes larger than

size 00. Roxane disagrees, contending that the amendment in question was clarifying, not

narrowing.

There is no dispute over the relevant facts about the prosecution history: 1) as originally

filed, claim 1 contained no express capsule size limitation; 2) the examiner rejected claim 1 as

obvious; 3) the applicants amended claim 1, adding in the "size 00 or less" limitation; and 4)

amended claim 1 was allowed after the PTAB reversed the examiner's obviousness rejection.

Roxane fails to persuade that this amendment did not narrow the scope of claim 1 – since

the incorporation of an express size limitation clearly narrowed the scope of the claim. Roxane

argues that applicants added the phrase "that is size 00 or less" only to clarify something, but it is

not clear what. Roxane's reply brief tries to convince that the amendment aimed "to clarify that

size 00 is an inherent characteristic of the antecedent 'pharmaceutically acceptable capsule.'"

(Pl.'s Reply Br. 8-9.) Roxane argues that the examiner had written a sentence using the phrase

"arriving at a capsule," and that the use of this phrase shows that the examiner misunderstood

that the claim was directed to a pharmaceutically acceptable capsule, and not merely a capsule.

The Court is not persuaded that the sentence at issue written by the examiner in the office action

demonstrated any substantial misunderstanding, nor that the amendment was directed toward

remedying a misunderstanding. Furthermore, if the applicants believed that the examiner had

misunderstood something, would it not have been sufficient to provide clarifying comments in

8

A8

response to the rejection?  As Roxane states in the reply brief, claim 1 prior to the amendment already specified a pharmaceutically acceptable capsule; why is new claim language needed if the problem was that the examiner misunderstood what had already been expressly included in the claim?  Furthermore, crucially, this Court does not see how adding in "that is size 00 or less" clarifies that the claim is directed not merely to a capsule, but to a pharmaceutically acceptable capsule.

Rather, the prosecution history shows that the applicants made a narrowing amendment to overcome a rejection.  As revised in the prior amendment of November 19, 2008, claim 1 stated:

> A calcium acetate capsule formulation comprising flowable granules comprised of a pharmaceutically acceptable amount of calcium acetate along with other pharmaceutically acceptable adjuvants, wherein said granules are filled into and contained within a pharmaceutically acceptable capsule.

(INVAGEN0003587.)  In the office action dated March 20, 2009, the examiner rejected this amended claim 1 as obvious over prior art references Dennett and Nakai.  (INVAGEN0003632-33.)  In the amendment of August 18, 2009, the applicants added this language at the end of claim 1: "such that 667 mg of said calcium acetate on an anhydrous basis are present in said capsule that is size 00 or less."  (INVAGEN0003639.)  In the remarks submitted with the amended claims, the applicants distinguished Nakai as follows: "Nakai's process of encapsulation without compression is deficient because its granular material cannot be filled and contained in capsules such that 667 mg of calcium acetate on an anhydrous basis is present in size 00 capsules."  (INVAGEN0003644.)  The applicants cited and submitted a declaration by applicant Dr. Uraizee which makes a detailed effort to distinguish Nakai.  (INVAGEN0003651-54.)

9

In this declaration, Dr. Uraizee explains that the Nakai patent "describes a wet granulation process to obtain calcium acetate granules." (INVAGEN0003652.) She then describes an experiment she did in which she attempted to use the Nakai process to make calcium acetate granules, and to then fill a size 00 capsule. (Id.) She reported that, using the granules she made with the Nakai process, she was only able to fill the size 00 capsule with approximately 600 mg. (Id.) Dr. Uraizee concluded that it was "impossible" to achieve a fill of 667 mg "and also maintain free flowing status of granules in a pharmaceutically acceptable capsule size (size 00 or less) using Nakai et al.'s process." (INVAGEN0003654.) Dr. Uraizee distinguished the inventive process as capable, unlike Nakai's process, of achieving the desired fill amount in the size 00 capsule. (Id.)

On December 12, 2009, the PTO issued a final rejection. (INVAGEN0003657.) The examiner stated that the declaration submitted was insufficient to overcome the rejection based on Nakai. (INVAGEN0003658.) Claims 1-9 were again rejected as obvious in view of Nakai. (INVAGEN0003660.) The examiner also cited the Torpac reference, stating, "Torpac teaches various capsules and their sizes. It's clear from the metric table that size 00 is about 50% bigger than size 0." (INVAGEN0003663.)

On March 6, 2010, the applicants filed a "Pre-Appeal Brief Request for Review." (INVAGEN0003673-77.) This document repeats the arguments made in the August 18, 2009 submission. (Id.) On July 7, 2010, the PTO issued a decision again rejecting claims 1-9, and instructing the applicants to proceed with the filing of their appeal. (INVAGEN0003685.) On August 9, 2010, the applicants filed a brief for an appeal before the Patent Trial and Appeal Board ("PTAB"). (INVAGEN0003686-707.) The applicants appealed the examiner's rejection

10

of claims 1-9, repeating the arguments based on Dr. Uraizee's experiment and her declaration. (INVAGEN0003694.) The applicants also argued that "Torpac merely discloses different capsule sizes and does not compensate for the deficiencies of Dennett and Nakai discussed above." (INVAGEN0003699.) The examiner filed an answer, and the applicants filed a reply. In the reply, the applicants stated, "although the Uraizee Declaration only tested size 00 capsules it is commensurate with the claims because since Nakai could not achieve the claimed fill amount in size 00 capsules it could not fill even smaller capsules with the claimed amount . . ." (INVAGEN0003730.)

On March 12, 2013, the PTAB issued its decision reversing all of the rejections. (INVAGEN0003759.) In short, the PTAB was persuaded by the applicants' arguments about Nakai and the Uraizee declaration. (INVAGEN0003757-59.) The PTAB stated: "we find that the Uraizee Declaration provides persuasive evidence to show that Nakai's process does not produce granules of calcium acetate that could provide size 00 capsules containing 667 mg of calcium acetate." (INVAGEN0003759.) The '032 patent issued.

There are two main points to be made from the prosecution history. The first concerns the meaning of the phrase term "size 00." The applicants submitted quite a few documents which discussed size 00 capsules and their fill capacity. Not once did this Court find any suggestion that the applicants understood "size 00" to refer to a family of sizes, or even two sizes. Throughout the prosecution history, the applicants' submissions consistently treat size 00 capsules – whether singular or plural – as capsules of one size only. The applicants' main point was that the Nakai process does not produce granules which will fill a size 00 capsule with 667 mg of calcium acetate. The Uraizee declaration does not suggest that various size 00 capsules

11

have differing fill capacities.[5]

The second point concerns the surrender of subject matter during prosecution.  On this record, it appears to this Court that the applicants filed a narrowing amendment to overcome an obviousness rejection.  The applicants amended claim 1 to limit it to capsules that are size 00 or smaller to distinguish Nakai, arguing that the Nakai process cannot produce such capsules.  The PTAB was persuaded, reversed the rejection, and the '032 patent issued.  Because this Court is not persuaded that the applicants understood "size 00" to refer to a family of sizes which includes capsule size 00el, this Court finds that the applicants surrendered coverage of any capsule larger than size 00.  The principle of prosecution history estoppel bars the applicants from recapturing this subject matter through the doctrine of equivalents.

The Court notes that the matter of the size of the capsule was not peripheral to the issues on appeal to the PTAB, but central.  The applicants' main point was that claim 1 had a capsule size limitation which distinguished the prior art.  The PTAB was persuaded and reversed the rejection.  The applicants unambiguously surrendered claim scope involving capsules larger than size 00.

Roxane has failed to persuade that it is reasonably likely to prove that Defendants' product infringes the '032 patent either literally or under the doctrine of equivalents.  This Court concludes that Plaintiff has failed to demonstrate a likelihood of success in showing

---

[5] It is also worth noting that the Torpac reference, which gives specifications for 15 different capsule sizes, does not mention any size "00el."  If the applicants understood "size 00" to be a family of sizes which included size 00el, when they traversed the rejection which cited Torpac, and they argued that the examiner's reference to Torpac did not support his point, why did they not argue that Torpac failed to disclose the full size 00 family of capsule sizes?  (See INVAGEN0003670-72.)

12

infringement. On this basis alone, the motion for a preliminary injunction must be denied.

**II.    Roxane has not demonstrated irreparable harm.**

This Court also finds that Plaintiff has not adequately demonstrated that it is likely to

suffer irreparable harm in the absence of preliminary relief. Roxane first argues that the harm is

irreparable because Defendants are unable to satisfy a judgment against them for infringement

damages. The Court is not satisfied that, given the nature of the market, it is at all clear that

Defendants, apparently the wholly-owned subsidiaries of a major corporation, Hetero Drugs Ltd.,

would be unable to pay damages.

Roxane next contends that it has suffered and will continue to suffer from price erosion

due to the alleged infringement, citing to Federal Circuit cases which find price erosion to be a

valid ground for finding irreparable harm. The cases cited by Roxane, however, are cases in

which the patentee had market exclusivity. See Purdue Pharma L.P. v. Boehringer Ingelheim

GmbH, 237 F.3d 1359 (Fed. Cir. 2001) (Purdue and OxyContin®); Celsis in Vitro, Inc. v.

CellzDirect, Inc., 664 F.3d 922, 924 (Fed. Cir. 2012) (Celsis and hepatocyte-preparation

method); Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1343 (Fed. Cir. 2008) (Abbott and

Biaxin® XL); and Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368 (Fed. Cir. 2006) (Sanofi

and Plavix®). There is no indication in these decisions that the patentees had competition from

others marketing an identical product.

As Defendants observe, Roxane is not the only player competing in the calcium acetate

market. Roxane entered the marketplace in October of 2008 after the branded calcium acetate

pharmaceutical, PhosLo® GelCaps, was on the market.[6] (Peterman Dec. ¶ 3.) In October of

---

[6] Like Roxane's product, PhosLo® GelCaps contain 667 mg of calcium acetate.

13

2009, Sandoz entered the market with an authorized generic version of PhosLo®. (Peterman Dec. ¶ 4.) At oral argument, Roxane presented two charts with historical sales data, one showing market share and one showing quarterly average selling prices (also at Peterman Dec. Ex. 2).

The chart showing historical average selling prices provides significant evidence against Roxane's price erosion argument. The chart shows that, in 2009, Roxane sold bottles of its product for an average price of approximately $80 per bottle. After Sandoz entered the market, the average price declined over the next two years to approximately $53 per bottle, but then rose over the following 2 years to approximately $75 per bottle. This shows that the price erosion was *not* irreversible – instead, the price erosion from the entry of a competitor into the market was, in fact, largely reversed. This Court is not persuaded that, under the unusual facts of this case, price erosion is irreversible.

With Invagen's product on the market, there are now at least four players in the marketplace selling 667 mg calcium acetate pharmaceuticals. This is not a case like <u>Sanofi</u>, where Sanofi was the only player in the market for Plavix, and Apotex challenged its position of exclusivity. At the present time, the status quo is a marketplace with four competitors. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." <u>Univ. of Tex. v. Camenisch</u>, 451 U.S. 390, 395 (1981). Roxane seeks not to preserve the status quo pending trial on the merits, but to alter it. The status quo is best preserved by denying, not granting, the application for a preliminary injunction.

This Court finds that Roxane has not sufficiently demonstrated its entitlement to a preliminary injunction. It has not shown that is likely to prove infringement, nor that it is likely to suffer irreparable harm in the absence of preliminary relief. Moreover, since the goal of a

14

A14

preliminary injunction is the preservation of the status quo, the status quo is best preserved by denying this motion.

For these reasons,

**IT IS** on this 6th day of August, 2014 hereby

**ORDERED** that Plaintiff's motion for a preliminary injunction (Docket Entry No. 43) is **DENIED**.

   s/ Stanley R. Chesler   
Stanley R. Chesler, U.S.D.J.

15



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

**UNITED STATES DEPARTMENT OF COMMERCE**

**United States Patent and Trademark Office**

**March 13, 2014**

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: **8,563,032**

ISSUE DATE: **October 22, 2013**

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office



W. MONTGOMERY

Certifying Officer

ROX-CA00003187



US008563032B2

(12) **United States Patent**
Economou et al.

(10) Patent No.: **US 8,563,032 B2**
(45) Date of Patent: **Oct. 22, 2013**

(54) **FORMULATION AND MANUFACTURING PROCESS FOR CALCIUM ACETATE CAPSULES**

(75) Inventors: **Julie Economou**, Dublin, OH (US); **Shehla Uraizee**, Dublin, OH (US)

(73) Assignee: **Roxane Laboratories, Inc.**, Columbus, OH (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 990 days.

(21) Appl. No.: **11/566,938**

(22) Filed: **Dec. 5, 2006**

(65) **Prior Publication Data**
US 2007/0128271 A1    Jun. 7, 2007

**Related U.S. Application Data**

(60) Provisional application No. 60/742,502, filed on Dec. 5, 2005.

(51) **Int. Cl.**
*A61K 9/48* (2006.01)
*A01N 37/00* (2006.01)

(52) **U.S. Cl.**
USPC ........................................... 424/451; 514/557

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,017,424 A | 4/1977 | Johnson et al. | |
| 4,071,331 A | 1/1978 | Johnson et al. | |
| 4,140,493 A | 2/1979 | Johnson et al. | |
| 4,508,893 A | 4/1985 | Koyama et al. | |
| 4,870,105 A | 9/1989 | Fordtran | |
| 5,347,046 A | 9/1994 | White et al. | |
| 5,603,971 A | 2/1997 | Porzio et al. | |
| 5,711,967 A * | 1/1998 | Juch .............................. | 424/462 |
| 5,767,107 A | 6/1998 | Chaundy et al. | |
| 5,897,897 A | 4/1999 | Porzio et al. | |
| 6,187,351 B1 | 2/2001 | Porzio et al. | |
| 6,201,053 B1 | 3/2001 | Dieckmann et al. | |
| 6,576,665 B2 | 6/2003 | Dennett, Jr. et al. | |
| 6,875,445 B2 | 4/2005 | Dennett, Jr. et al. | |
| 2003/0050340 A1 | 3/2003 | Dennett, Jr. et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 237345 | * | 9/1987 |
| JP | 04235942 A | * | 8/1992 |

OTHER PUBLICATIONS

Macco Organiques (www.macco.ca., see products), 2005, 1 sheet.*
Torpac, http://www.erowid.org/archive/rhodium/pdf/gelcap.sizechart.pdf, 1-3.*

* cited by examiner

*Primary Examiner* — Daniel Sullivan
*Assistant Examiner* — Kyle Purdy
(74) *Attorney, Agent, or Firm* — Pearne & Gordon LLP

(57) **ABSTRACT**

The present invention relates to a pharmaceutical calcium acetate formulation and a process for making the same. In particular, the present invention relates to a calcium acetate capsule formulation comprising granules comprising calcium acetate along with other formulation adjuvants contained within a pharmaceutically acceptable capsule.

**9 Claims, 1 Drawing Sheet**

Copy provided by USPTO from the PIRS Image Database on 03/06/2014

ROX-CA00003188

**U.S. Patent**　　　　　**Oct. 22, 2013**　　　　　**US 8,563,032 B2**

FLOW DIAGRAM OF THE MANUFACTURING PROCESS



Copy provided by USPTO from the PIRS Image Database on 03/06/2014

ROX-CA00003189

A103

US 8,563,032 B2

1

## FORMULATION AND MANUFACTURING PROCESS FOR CALCIUM ACETATE CAPSULES

This application claims the benefit of the filing date of U.S. Provisional Application No. 60/742,502, filed on Dec. 5, 2005, which is incorporated herein by reference in its entirety.

### FIELD OF THE INVENTION

The present invention relates to a pharmaceutical calcium acetate formulation and a process for making the same. In particular, the present invention relates to a calcium acetate capsule formulation comprising granules comprising a pharmaceutically acceptable amount of calcium acetate along with other formulation adjuvants contained within a pharmaceutically acceptable capsule.

### BACKGROUND OF THE INVENTION

In the pharmaceutical industry, there are many pharmaceutical products which are difficult to manufacture into palatable dosage forms due to the intrinsic properties of the active ingredient. For example, many pharmaceutically active ingredients have properties which are such that in order to formulate a single does, large quantities must be used. Accordingly, either multiple doses must be taken or single dose forms are large in size making them difficult to swallow. Additionally, many pharmaceutically active compounds are unpleasant tasting which, in turn, limits the forms in which they can be produced to alleviate this property.

Phosphorous binders bind phosphorus in the form of a phosphorous ion within the stomach and intestines and are useful in the treatment of patients with chronic renal disease. This process is thought to result from a chemical reaction between dietary phosphorus and the cation present in the binder compound. The reaction causes the formation of insoluble and hence unabsorbable phosphate compounds. The cation in some phosphorous binders is aluminum or calcium. Despite their capacity for binding phosphorous, large quantities of antacids must be ingested over a long period of time for them to be effective. Therefore, dosage size and palatability are particularly important for patients with chronic renal disease.

Calcium acetate is a particularly effective medication which is commonly used in the treatment of chronic renal failure, or hyperphosphatemia. Calcium acetate binds phosphorus in the gastrointestinal tract and reduces the percentage of consumed phosphorus which is absorbed into the bloodstream. Calcium acetate is particularly effective in reducing phosphorous absorption when it is administered relatively close in time to food consumption. Calcium acetate is typically administered orally. However, one common drawback to conventional calcium acetate formulations is that calcium acetate, like many other antacids, has unpleasant, chalky taste.

Calcium acetate had been traditionally formulated as tablets. However, the tablet form of calcium acetate does little to enhance the palatability of the active compound. Attempts to address this concern include encapsulation of caplets of the calcium acetate as disclosed in U.S. Pat. Nos. 6,576,665 and 6,875,445. These patents also relate to a specific useful bulk density of the calcium acetate as being from 0.55-0.75 g/cc.

Current calcium acetate formulations on the market include PHOSLO Gelcaps which comprise a 667 mg dose of calcium acetate manufactured as caplets placed inside a capsule shell (Size 0). However, the process which is used to

2

generate the encapsulated caplets involves both a tablet forming step to formulate the caplet and special equipment to encase the caplet in an outer capsule. Accordingly, a simplified, more efficient process, compared to the process for producing the encapsulated caplet formulation, which produces a calcium acetate product that provides an effective dose of the active product without the unpleasant taste associated with the calcium acetate active substance, would be desirable.

### SUMMARY OF THE INVENTION

The present invention comprises capsules filled with granules of calcium acetate. More specifically, the present invention relates to a calcium acetate capsule formulation comprising granules wherein the granules are comprised of a pharmaceutically acceptable amount of calcium acetate along with other formulation adjuvants contained within a pharmaceutically acceptable capsule.

According to one aspect of the invention, the bulk density of the calcium acetate used in the formulation according to the present invention is typically less than about 0.55 g/cc. In a further embodiment, the bulk density of the calcium acetate is between about 0.30 g/cc to less than about 0.55 g/cc. In a further embodiment, the calcium acetate has a bulk density of less than about 0.50 g/cc. In yet another embodiment, the calcium acetate has a bulk density of less than about 0.45 g/cc. In a further embodiment, the calcium acetate has a bulk density of from about 0.30 g/cc to about 0.45 g/cc.

According to another aspect of the invention, calcium acetate is formulated with various adjuvants to aid in the filling of the capsules. In particular, various glidants and lubricants may be added to the calcium acetate to improve flowability of the powder blend.

According to another aspect of the invention, a blend of calcium acetate and formulation adjuvants is granulated to aid in the filling of the capsules. The granulation can be achieved through the use of granulation equipment such as a roller compactor. In a further aspect of the invention, granulation of the calcium acetate results in the final blend having a median particle size of from about 450 microns to about 600 microns. According to another aspect of the invention, a blend of calcium acetate and formulation adjuvants are sized such that about 75% of the particles are retained on a 150 micron sieve.

Another aspect of the invention is directed to a process for encapsulation of granulated calcium acetate. A further aspect of the invention relates to a process for manufacturing capsules comprising calcium acetate wherein the process comprises the steps of:

a) blending a portion of a pharmaceutically acceptable amount of calcium acetate and a first lubricant, such as polyethylene glycol, and then passing the blend through a mill to deagglomerate the blend and then mixing the deagglomerated blend to form a first blend;

b) adding to the first blend, the remaining portion of the pharmaceutically acceptable amount of the calcium acetate to a portion of a pharmaceutically acceptable amount of a second lubricant, such as magnesium stearate, NF, blending and mixing to form a second blend;

c) passing the second blend of step b) through a mill to deagglomerate the second blend and mixing again;

d) granulating the second blend of step c) using a roller compactor to form a granulated product;

e) passing the granulated product of step d) through a comill to size the granules to a pharmaceutically acceptable size;

Copy provided by USPTO from the PIRS Image Database on 03/06/2014

ROX-CA00003190

US 8,563,032 B2

**3**

f) adding the second blend and the remaining pharmaceutically acceptable amount of the second lubricant, e.g., magnesium stearate, and blending to form a final blend;

g) filling the final blend of step f) into capsules using an encapsulation device.

Advantages of this process include, but are not limited to the following: (1) The process of the invention requires no additional purchase or modification of existing conventional capsule manufacturing equipment, (2) the process is simple and less time consuming than the caplet/capsule process described in the prior art literature (i.e. compression into tablets or caplets is not needed), and (3) the bulk density of the calcium acetate can be lower than that required by the prior art and is not restricted to the particular range recited in the patent literature.

BRIEF DESCRIPTION OF THE DRAWING

The FIGURE is a flow diagram which depicts an example of the manufacturing process used to make the calcium acetate capsules of the invention.

DETAILED DESCRIPTION OF THE INVENTION

The present invention comprises the production of calcium acetate capsules. The calcium acetate capsules of the invention are formulated by filling a pharmaceutically acceptable capsule with granules comprised of calcium acetate and other formulation adjuvants. According to one embodiment of the invention, the capsule is a size 00 capsule containing 667 mg of calcium acetate. Capsules containing smaller doses of the calcium acetate can be sized accordingly using smaller capsules.

The bulk density of the calcium acetate used in the invention was measured in accordance with USP <616>, Method I. According to USP <616>, the bulk density is determined by measuring the volume of a known mass of powder that has been passed through a screen into a graduated cylinder. The bulk density of the calcium acetate used in the granulated formulation of the invention is less than about 0.55 g/cc and preferably less than about 0.45 g/cc. In another preferred embodiment, the bulk density is between about 0.30 g/cc to about less than 0.55 g/cc. More preferably the bulk density is between about 0.30 g/cc to about 0.45 g/cc.

A further aspect of the invention is that it has a tap density of from about 0.45 g/cc to about 0.65 g/cc. In one embodiment, the tap density of the calcium acetate is about 0.60 g/cc. The tap density was measured in accordance with USP <616>, Method II. According to USP <616>, the tapped density is achieved by mechanically tapping a measuring cylinder containing a powder sample. After observing the initial volume, the cylinder is mechanically tapped and volume readings are taken until little further volume change is observed. The mechanical tapping is achieved by raising the cylinder containing the sample and allowing it to drop under its own weight a specified distance according to one of two methods (Method I and II as outlined in the USP). According to USP <616>, Method II, for tapped density, a mechanical tapped density tested is used which provides a fixed drop of the cylinder of 3 mm (±10%) at a nominal rate of 250 drops per minute.

In order to be able to fill the capsules using a capsule filling machine, for example an IMA, at a rate that would be commercially viable, the drug, along with other formulation adjuvants, is formulated into a final blend which is then granulated. According to one aspect of the invention, the calcium acetate and other formulation adjuvants are granulated using

**4**

a roller compactor. Other granulation processes including, but not limited to, high shear, low shear and fluidized bed technology, can be used in place of roller compaction. Granulation of the calcium acetate and other adjuvants is conducted such that the calcium acetate final blend has a median particle size of from about 450 microns to about 600 microns. According to another aspect of the invention, a blend of calcium acetate and formulation adjuvants are sized such that about 75% of the particles are retained on a 150 micron sieve.

Pharmaceutically acceptable adjuvants include, but are not limited to, disintegrants, diluents, lubricants, glidants, and blends thereof. Glidants and lubricants may be added to a formulation to improve the flowability of a powder blend, reduce powder adhesion to equipment, and to improve the consistency of dosage weight. In particular, calcium acetate having a bulk density of between about 0.30 g/cc to less than about 0.55 g/cc was found to have flowability problems when attempting to fill capsules with the active calcium acetate alone. According to the invention, it has been found that incorporation of adjuvants, such as lubricants and/or glidants in the formulation and granulating the formulation addresses the flowability issues so that economical and efficient manufacture of calcium acetate capsules is achieved. Adjuvants that may function as glidants include colloidal silicon dioxide, magnesium silicate, powdered cellulose, starch, talc and tribasic calcium phosphate, and mixtures thereof. Lubricants include magnesium stearate, calcium stearate, glyceryl monostearate, glyceryl palmitostearate, glyceryl behenate, hydrogenated castor oil, hydrogenated vegetable oil, mineral oil, polyethylene glycol, sodium benzoate, sodium lauryl sulfate, sodium stearyl fumarate, stearic acid, talc, zinc stearate, and mixtures thereof.

An exemplary, but non-limiting, formulation and process for manufacturing the same are described in detail below:

Formulation:

| Calcium Acetate Capsules, 667 mg | Quantitative Composition (mg/capsule) |
|---|---|
| Calcium Acetate, USP (Powder) | 710* |
| Polyethylene Glycol 8000, NF (Carbowax 8000) | 38.6 |
| Magnesium Stearate, NF | 11.4 |
| Theoretical Capsule Fill Weight (mg) | 760 |

*The water content specification for calcium acetate USP (Powder) is 5.0-7.0%. Based on 6% w/w water content, 710 mg of calcium acetate, USP (Powder) is equivalent to 667 mg of calcium acetate on an anhydrous basis. Since the water content range of calcium acetate, USP (Powder) is narrow (5.0-7.0%), the assay values of the finished product are expected to range from 99-101% of the labeled amount. Therefore, no adjustments are made in the formulation to accommodate for the lot to lot variation in the water content.

Manufacturing Process:

According to the invention, a process for manufacturing the encapsulated granulated calcium acetate consists of the following steps:

a) blending a portion of a pharmaceutically acceptable amount of calcium acetate and a first lubricant, such as polyethylene glycol, and then passing the blend through a mill to deagglomerate the blend and then mixing the deagglomerated blend to form a first blend;

b) adding to the first blend, the remaining portion of the pharmaceutically acceptable amount of the calcium acetate to a portion of a pharmaceutically acceptable amount of a second lubricant, such as magnesium stearate, NF, blending and mixing to form a second blend;

c) passing the second blend of step b) through a mill to deagglomerate the second blend and mixing again;

Copy provided by USPTO from the PIRS Image Database on 03/06/2014

ROX-CA00003191

US 8,563,032 B2

| 5 | 6 |

d) granulating the second blend of step c) using a roller compactor to form a granulated product;

e) passing the granulated product of step d) through a comil to size the granules to a pharmaceutically acceptable size;

f) adding the second blend and the remaining pharmaceutically acceptable amount of the second lubricant, e.g., magnesium stearate, and blending to form a final blend;

g) filling the final blend of step f) into capsules using an encapsulation device.

Advantages of this process include, but are not limited to the following: (1) The process of the invention requires no additional purchase or modification of existing conventional capsule manufacturing equipment, (2) the process is simple and less time consuming than the caplet/capsule process described in the prior art literature (i.e. compression into tablets or caplets is not needed), and (3) the bulk density of the calcium acetate can be lower than that required by the prior art and is not restricted to the particular range recited in the patent literature.

The following Example is representative of the process for making the encapsulated granulated calcium acetate product of the invention:

EXAMPLE 1

Capsules of calcium acetate containing a 667 mg dose of the active calcium acetate ingredient, having a bulk density of 0.47 g/cc, were prepared according to the following process:

In an 8 L bin, 1.211 kg of calcium acetate was added along with 1.211 kg of Carbowax 8000 (a polyethylene glycol). The components were then blended at a speed of 45 rpm for 120 revolutions. The mixture was then passed through a comil equipped with a 0.055 inch round screen at a speed of 608 rpm to form a first blend. In a separate 100 L bin, 17.326 kg of calcium acetate was added along with 0.084 kg magnesium stearate and the first blend of materials. This mixture was then blended at a speed of 13 rpm for 120 revolutions. This mixture was then passed through a comil equipped with a 0.055 inch round screen at a speed of 608 rpm. The milled mixture was then blended again in a bin blender at a speed of 13 rpm for 120 revolutions to form a second blend. The second blend was then passed through a roller compactor having a breaker rpm of 100 rpm and a hydraulic pressure of 30 Bar to granulate the second blend. The granulated second blend was then passed through a comil having a 0.040 inch grater screen at a speed of 608 rpm. The second blend was then mixed with 101 g of magnesium stearate (which had been passed through a comil having a grater screen size of 0.05 inches) and blended at 16 rpm for 60 revolutions to form a final blend. The final blend was then filled into size 00 capsules using an IMA capsule filling machine wherein the resulting filled capsules had a weight of 880 mg and contained 760 mg of the final blend, including a 667 mg dose of calcium acetate.

Calcium acetate capsules produced in accordance with the invention were tested for dissolution in water. In a first series of tests, the dissolution of the calcium acetate from 6 capsules after 10 minutes was at least 86% with at least 96% dissolution at 15 minutes.

TABLE 1

| | % LA (Labeled Amount) (667 mg Capsules) | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 10 min | 87 | 96 | 102 | 93 | 94 | 86 |
| 15 min | 105 | 101 | 99 | 100 | 104 | 96 |

In a second series of tests, the dissolution of calcium acetate from 6 capsules was at least 95% at 10 minutes with complete dissolution at 15 minutes.

TABLE 2

| | % LA (667 mg Capsules) | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 10 min | 117 | 109 | 96 | 117 | 104 | 95 |
| 15 min | 106 | 105 | 107 | 110 | 120 | 102 |

As can be seen from the above examples, the calcium acetate capsules containing granulated calcium acetate were able to be produced using conventional granulation and encapsulating equipment and procedures wherein the resulting products have dissolution rates which are acceptable for immediate release formulations of calcium acetate.

While various embodiments in accordance with the present invention have been shown and described, it is understood the invention is not limited thereto, and is susceptible to numerous changes and modifications as known to those skilled in the art. Therefore, this invention is not limited to the details shown and described herein, and includes all such changes and modifications as encompassed by the scope of the appended claims.

What is claimed is:

1. A calcium acetate capsule formulation comprising flowable granules comprised of a pharmaceutically acceptable amount of calcium acetate along with other pharmaceutically acceptable adjuvants, wherein said granules are filled into and contained within a pharmaceutically acceptable capsule such that 667 mg of said calcium acetate on an anhydrous basis are present in said capsule that is size 00 or less.

2. The calcium acetate formulation of claim 1 wherein the calcium acetate has a bulk density of less than about 0.55 g/cc.

3. The calcium acetate formulation of claim 1 wherein the calcium acetate has a bulk density of less than about 0.50 g/cc.

4. The calcium acetate formulation of claim 1 wherein the calcium acetate has a bulk density of less than about 0.45 g/cc.

5. The calcium acetate formulation of claim 1 wherein the calcium acetate has a bulk density of from about 0.30 g/cc to about 0.45 g/cc.

6. The calcium acetate formulation of claim 1 wherein the pharmaceutically acceptable adjuvants are selected from disintegrants, diluents, lubricants, glidants and blends thereof.

7. The calcium acetate formulation of claim 6 wherein the adjuvants are selected from polyethylene glycol, magnesium stearate and blends thereof.

8. The calcium acetate formulation of claim 1 wherein the granules have a median particle size of from about 450 microns to about 600 microns.

9. The calcium acetate formulation of claim 1 wherein the granules are sized such that about 75% of the particles are retained on a 150 micron sieve.

*    *    *    *    *

Copy provided by USPTO from the PIRS Image Database on 03/06/2014

ROX-CA00003192

A106